# OCTOBER TERM, 1909.*

ARMOUR & CO. v. STATE DAIRY AND FOOD COMMISSIONER.

1. FOOD—ADULTERATION—STATUTES—SAUSAGE.

The sale by retailers to consumers of sausage made with the addition of cereal, and not labeled so that the public may know of the combination, although the product is properly labeled in the original package purchased at wholesale, is illegal under Act No. 193, Pub. Acts 1895, 2 Comp. Laws, § 5010 *et seq.*, being an adulteration within the prohibition of the act.

2. SAME—SAUSAGE—WORDS AND PHRASES—PURE FOOD LAWS.

Sausage made of chopped pork, beef and veal with a filler of cereal, seasoned with salt and spices, and mixed with pure water, is not unwholesome or injurious to the health, and may be sold as a mixture or compound within the meaning of the statute, when labeled in such a manner as to show the consumer that it contains cereal.

3. SAME—SAUSAGE—WORDS AND PHRASES.

Sausage is an article of food composed of meat, salt, and spices.

4. STATUTORY CONSTRUCTION — STATUTES — ORDINARY AND TRADE MEANINGS.

In construing such statute the court will adopt the meaning of the word sausage which is generally understood and intended, not a meaning peculiar to the trade or to certain manufacturers.

Appeal from Ingham; Wiest, J. Submitted October 7, 1909. (Docket No. 20.) Decided December 10, 1909.

Bill by Armour & Company against Arthur C. Bird, State dairy and food commissioner, and others, to restrain

---

* Continued from Vol. 158.

defendants from interfering in the sale of sausage in the State. From a decree dismissing the bill, complainant appeals. Modified.

*Gore & Harvey* (*Thomas, Cummins & Nichols, Ralph W. Shauman,* and *A. R. Urion,* of counsel), for complainant.

*John E. Bird,* Attorney General (*Charles W. McGill* and *George S. Law,* of counsel), for defendants.

Complainant is a corporation organized under the laws of the State of New Jersey, with headquarters in Chicago, Ill. It is, and has been for many years, engaged in the manufacture and sale of fresh and cured meats and sausage and other meat products. Its sale of these products, including sausage, extended over the entire State of Michigan. In the year of 1906 the defendant the dairy and food commissioner caused chemical examination to be made of the various brands of sausage sold within the State, including that of the complainant, and found that many of them contained cereals and a percentage of water greater than that found in meat alone. On January 16, 1907, he issued the following circular:

"*Gentlemen:* A growing tendency on the part of manufacturers of sausage, bolognas, and similar meat products, to use various preparations and substances foreign to the legitimate ingredients necessary to the manufacture of these articles of food, the said preparations being commonly known and designated as fillers, binder, etc., has prompted this department to make a thorough investigation into such sausages. This has been done for the purpose of ascertaining the true reasons for the widespread practice of using the preparations mentioned.

"The results obtained from the investigation as carried on in the department laboratory lead to but one conclusion, viz., that the addition of so-called binders and fillers to meat products is primarily for the purpose of substituting in part an inferior or cheaper substance for a legitimate ingredient, thereby lessening the cost of manufacture.

"The first and second subdivisions of section 5012 of the Compiled Laws provide that an article shall be deemed to be adulterated within the meaning of the act—*first*, if any substance or substances have been mixed with it so as to lower or depreciate or injuriously affect its quality, strength or purity; *second*, if any inferior or cheaper substance or substances have been substituted wholly or in part for it.

"Basing its ruling on the subdivisions of section 5012 above cited, this department holds that the addition of the so-called binders and fillers mentioned to meat products is contrary to law. From and after this day manufacturers and dealers will be held to a strict account for each and every violation. Provided, however, that dealers within the State are given until January 25, 1907, to dispose of stocks on hand.                                "Yours very truly,
                                        "A. C. Bird,
                "State Dairy and Food Commissioner."

This circular was sent to all the meat dealers of the State, and a copy sent to the complainant at Chicago. Those employed under the direction of the defendant food commissioner also verbally informed the retail dealers of the State that they would be prosecuted if they did not comply with the above order.

The trade of the complainant in Michigan was very large, and the effect of this circular, and the threats of prosecution verbally made, naturally tended to decrease very largely the complainant's sales in this State, and to cause it considerable loss. Therefore, on November 18, 1907, complainant filed its bill of complaint in this cause, setting forth the above circular and threats on the part of the defendants, the injury to its business, that defendants were acting illegally in their conduct, and praying that they be restrained from—

"Declaring in any manner, orally or in writing, to the customers and patrons of your orator, or to the people of the State of Michigan, that the sausages and other meat products of your orator containing cereal manufactured and sold, and offered for sale in the State of Michigan, are sold and offered for sale in violation of any statute of the State of Michigan."

The bill alleges that the sausage manufactured and sold by the complainant bear labels showing their respective ingredients in accordance with the standard fixed by the laws of the United States and the regulations of the department of agriculture thereunder; a sample of said labels being set forth in the bill and reading as follows:

---

A R M O U R' S
. "D E V O N S H I R E"
Farm Style
SAUSAGE MEAT.
Made from the Meat of Hams and
Selected Young Pork.  Prepared with
Choicest spices and cereals.
Armour & Company.

---

U. S. Inspected and passed under the
Act of Congress of June 30, 1906.
Establishment 2 A.

---

An answer was duly filed denying that the sausage manufactured and sold by the complainant in this State containing cereals and water is a wholesome product, or that it is manufactured in accordance with Act Cong. June 30, 1906, chap. 3915, 34 Stat. 768 (U. S. Comp. Stat. Supp. 1909, p. 1187), and the regulations of the United States department of agriculture, or that it is a compound or mixture within the meaning of the proviso of section 3, Act No. 193, Pub. Acts 1895, as amended.  The answer admits that the sausage of the complainant is shipped into this State in packages, or boxes, labeled with the trade-name of the sausage, and the words "with cereal," but alleges that the consumer or purchaser of the retail dealer is in no way advised, when he purchases, that the sausage contains cereal, or cereal and added water, unless such purchaser purchased the entire package shipped to the dealer, and that even then he was not informed that the product contains added water.

Both the bill and answer contain other allegations which we deem it unnecessary to state.  Issue was joined, proofs taken in open court and by deposition, and, after a

full hearing, decree was entered dismissing the bill.     The statute (2 Comp Laws, § 5012) under which defendants claim to justify their action is as follows:

"An article shall be deemed to be adulterated within the meaning of this act: *First*, if any substance or substances have been mixed with it, so as to lower or depreciate or injuriously affect its quality, strength or purity; *second*, if any inferior or cheaper substance or substances have been substituted wholly or in part for it; *third*, if any valuable or necessary constituent or ingredient has been wholly or in part abstracted from it; *fourth*, if it is an imitation of, or is sold under the name of another article; *fifth*, if it consists wholly or in part of a diseased, decomposed, putrid, infected, tainted or rotten animal or vegetable substance or article, whether manufactured or not, or, in the case of milk, if it is the product of a diseased animal; *sixth*, if it is colored, coated, polished, or powdered whereby damage or inferiority is concealed or if by any means it is made to appear better or of greater value than it really is; *seventh*, if it contains any added substance or ingredient which is poisonous or injurious to health: *Provided*, That nothing in this act shall prevent the coloring of pure butter: *And provided further*, That the provisions of this act shall not apply to mixtures or compounds recognized as ordinary articles or ingredients of articles of food, if each and every package sold or offered for sale bear the name and address of the manufacturer and be distinctly labeled under its own distinctive name, and in a manner so as to plainly and correctly show that it is a mixture or compound, and is not in violation with definitions fourth and seventh of this section."

GRANT, J. (*after stating the facts*).     The following facts are admitted or established beyond controversy:

(*a*) The sausage manufactured by the complainant is a wholesome article of food.     It contains nothing deleterious to health.

(*b*) It is a mixture or compound within the meaning of the proviso in the statute above quoted, being composed of meat, cereal, salt, and spices.

(*c*) It is made in accordance with the act of congress and directions prescribed thereunder by the commissioner of agriculture, and under the inspection of the United States inspectors.

(*d*) Sausage is made of different kinds of meat, viz., pork, beef, and veal. Whether manufactured for interstate commerce or domestic use within the State, it is sometimes made with cereal, and sometimes without it. Cereal is not a necessary ingredient to its manufacture, although it has been used by most manufacturers for many years.

(*e*) Water is an essential ingredient in the manufacture of sausage, whether made with or without cereal.

This is shown by the evidence of the defendants. One of their witnesses, with an experience of 35 years, testified:

"In the manufacture of pork sausage we use pork, and, if the pork is a little too fat, we put in some veal or beef. * * * It is necessary to have a little water added, a quart and a half to 100 pounds. It is pretty hard to make them without. We use a little more water than would be found in the meat when freshly killed."

Another, who has been engaged in the manufacture of sausage since 1864, testified:

"I put a little water in pork sausage. I use from 5 to 10 pounds of water to 100 pounds of meat. Enough to make it pliable, that is all. I use from 8 to 10 pounds of water in making beef sausage. I presume you could make sausage without water, but you could not stuff it very well."

Another, who learned to make sausage in Germany, testified:

"I have always used water, and still use water in the manufacture of sausage. Water is necessary. They use water in making sausage in Germany. So far as I know, every one used it."

The United States regulations require that the water used shall be pure.

(*f*) It is not in violation of definitions 4 and 7 of the act.

It does not violate definition 7 because it contains no substance or ingredient poisonous or injurious to health. It does not violate definition 4 because meat is the basis

and principal ingredient of the article.   As manufactured by complainant, it contains from 2 to 10 per cent. of cereal. It is and has been for more than 40 years recognized in the trade as sausage.   When sold as sausage with cereal added, it deceives no one, is not an imitation, and manufacturers are entitled to manufacture and label it as sausage with cereal.   It is not contended that manufacturers have not the right to use the name "sausage" when sold with a proper label.

The Federal statute is practically identical with that of Michigan, and contains a proviso reading:

"That an article of food which does not contain any added poisonous or deleterious ingredients shall not be deemed to be adulterated or misbranded in the following cases:   *First.* In the case of mixtures or compounds which may be now or from time to time hereafter known as articles of food under their own distinctive names, and not an imitation of or offered for sale under the distinctive name of another article, if the name be accompanied on the same label or brand with a statement of the place where said article has been manufactured or produced." 34 U. S. Stat. p. 771, § 8, subd. 4 (U. S. Comp. Stat. [Supp. 1907], chap. 3915, § 8, subd. 4).

Acting under this law, the department of agriculture, on September 12, 1906, adopted the following regulation:

"Sausages and Chopped Meats.   The word 'sausage' without a prefix indicating the species of animal is considered to be a mixture of minced or chopped meats with or without spices. If any species of animal is indicated as pork sausage, the sausage must be wholly made from the meat of that species.   If any flour or other cereal is used the label must so state.   If any other meat product is added, the label must so state."

To this regulation the department added "manufacturers are warned that the above rulings do not exempt them from the enforcement of State laws."   The learned circuit judge in his opinion found that sausage manufactured as is that of the complainant "is probably as healthy as pure sausage such as was known to the fathers."

Briefly stated, then, the case is this: Complainant, a resident of another State, is manufacturing and shipping into this State a wholesome article of interstate commerce in strict accord with the law and regulations of the Federal government. State law cannot interfere with this interstate traffic. The law here involved does not attempt to interfere with it, or to deny to the complainant the right to sell and ship its goods to retail dealers in this State. There are, therefore, but two questions material to the determination of this controversy, viz.:

(1) May the State through its legislature enact laws regulating the domestic sales of this product to consumers within the State?

(2) Does the statute above cited include the product made by the complainant?

It is not contended that the State is not clothed with the power to regulate the domestic sale of such products after their shipment into the State. Intoxicating liquor, which is a subject of interstate commerce, may be shipped into this State in original packages, but it cannot be sold within the State in violation of the State laws regulating or prohibiting its sale. No contention is made that the State statute in question is not constitutional and reasonable. Pure food laws have been enacted probably in all the States, and have been universally held valid when reasonable. The sole question, therefore, left to determine, is whether the statute includes sales to consumers in small quantities taken from the original packages. If the domestic dealer were to sell an original package labeled as above to the consumer, such sale would be valid, because the label complies with the law and notifies the purchaser that the article is not a sausage of meat alone, but a sausage composed of meat and cereal. It is not contended that manufacturers of sausage have not the right to label their product "sausage" with the statement added that it is mixed with other products, specifying them.

If we understood the position of counsel for complain-

ant correctly, it is that in construing this statute courts should be governed, not by the popular and common understanding of the meaning of the word "sausage," but by its trade and commercial meaning; that is, its meaning as understood between the manufacturers and their customers to whom they sell for retail to consumers. They say:

"It is unmistakable that the legislature understood it was enacting a law with reference to an article of food which was then a subject of trade and commerce among the people. There were at times scores of different kinds of 'sausage' upon the market; that is, sausage made in different ways, a difference in the ingredients used in the various kinds, and a variance in the proportions used; and different manufacturers and dealers made and dealt in different kinds, and each knew that all this variety of meat food products were included in the term 'sausage,' and the legislature is charged with knowledge of that fact, and must be presumed to have used the term 'food' accordingly."

In support of this, they cite several cases from the Federal courts construing the tariff or duty acts, in which it has been held that the laws of congress imposing duties upon imported goods must be construed with reference to the trade or commercial meaning of the articles mentioned in the law. Among the cases cited are *Two Hundred Chests of Tea,* 9 Wheat. (U. S.) 430; *Cadwalader* v. *Zeh,* 151 U. S. 171 (14 Sup. Ct. 288); *McCoy* v. *Hedden,* 38 Fed. 89.

In *Two Hundred Chests of Tea* it was held that "bohea tea" was used in the duty act in its known commercial sense, viz., "that article which in the known usage of the trade acquired that distinctive appellation."

In *Cadwalader* v. *Zeh* the question was whether under the duty act earthenware consisting of small cups, saucers, mugs, etc., having on them pictures of animals and other objects, and letters of the alphabet, should have been assessed as toys with 35 per cent. *ad valorem,* or as china, etc., with 60 per cent. *ad valorem.* The case was held

to depend upon the commerial meaning of the word "toys."

In *McCoy* v. *Hedden* the question was whether curry-combs were dutiable under a provision imposing a duty upon combs of all kinds. If they were not known to the trade among merchants as combs, they were held not dutiable as such. These and other similar cases arose between the United States and importers of foreign goods, and do not apply to cases arising under the pure food laws of State governments. Courts will take cognizance of the well-known fact that farmers, laboring men, and consumers are not generally familiar with the customs of trade and commerce in importing goods, or of understandings of the trade between manufacturers and merchants who buy those products for retail trade. Such construction would emasculate the pure food laws, and deprive the people of the protection which the legislature wisely intended to give them.

"Sausage" is defined by all the lexicographers as an article of food composed of meat, salt, and spices. See Worcester's and Century Dictionaries. The people generally so understand it. The writer of this opinion would be compelled to admit that until very recently he had no knowledge that cereal was used in the manufacture of sausage. It is too manifest for further argument that the legislature in enacting the law was not providing for the regulation of sales between manufacturers and merchants, but between retail dealers and consumers. They enacted the law solely for the protection of consumers—the people who buy and eat the products. The consumer who prefers sausage made of meat alone is entitled to be informed that he is buying such an article. The consumer who prefers sausage mixed with cereal is entitled to know that he is purchasing that article. The contention of the complainant, if sustained, would deprive the consumer of this right which the statute plainly gives him. We cannot follow *State* v. *Neslund*, 141 Iowa, 461 (120 N. W. 107), wherein it is held that sales in small quantities from orig-

inal packages are not within the statute. In that case a pound of lard was sold from a 50 pound package properly labeled with its constituent parts, but it was held that the retail dealer was not required to label the small packages sold. That opinion is based upon the well-known rule that penal statutes must be strictly construed. The statute of Michigan expressly provides that these mixtures must be labeled showing the different kinds of ingredients contained in them. Section 2 of Act No. 193, Pub. Acts 1895, is as follows:

"The term food, as used herein, shall include all articles used for food or drink, or intended to be eaten or drank by man, whether simple, mixed, or compound."

This is a general statute covering all food products not otherwise specifically provided for. We consider its provisions perfectly plain, and not subject to any misunderstanding or uncertainty. To hold otherwise would substantially exclude all the benefits and protection to the people of the State which the statute was clearly designed to grant. We therefore hold that retail packages of small amounts taken from the original package of the manufacturer, and sold to the consumer, must be properly labeled as the law directs.

The court below dismissed the complainant's bill, thereby granting it no relief whatever. In view of the position taken by the food commissioner in his circulars and answer herein filed, and in view of the importance to the complainant, and to the people of the State to know under what conditions a wholesome article of interstate commerce may be sold in this State, we think the learned circuit judge should have entered a decree defining the rights and determining under what conditions complainant, as well as other manufacturers, may have their valuable and wholesome products sold by the retail dealers, and to restrain the defendants from interfering with such legitimate sales.

The food commissioner, as above stated, denied in his

answer that the sausage made by the complainant was a wholesome product, or that it was a mixture or compound within the meaning of the act, and insisted that it was an adulteration. His attitude is further shown by his reply to complainant's letter of January 17, 1907, asking "if there would be any objection to using cereal if such fact is stated on label same as provided by National law." He denied this permission, which was not only a compliance with the Federal law, but a compliance with the State law.

The use of cereal in the manufacture of sausage has been very general. The State food and dairy commissioner of Iowa, who at the time of the hearing below had held office for five years, testified to its general use in that State, stating that "the ingredients used by the Iowa manufacturers in making sausage are chopped meats, salt, spices, flour and sufficient water." In July, 1907, he issued a bulletin stating:

"The commissioner has no authority to establish standards for the information of the public. It is here stated that this department will not interfere with the sale of sausage because of the presence of wholesome flour, provided that an analysis does not show more than five per cent. of such flour."

It appears to be established by the evidence that sausage made with cereal is sold cheaper than that made of meats alone. If so, the people desiring to buy and eat the cheaper product should have the privilege of doing so, and such product should not by any decision of the court be prohibited from sale.

The opinion of the circuit judge does not prohibit its sale when properly labeled. He held that the trouble was not with the use of cereal, but in permitting the product to be sold at the retail counter without informing the customer that cereal is a part of it. Counsel for respondents conceded in the oral argument in this court that it was a wholesome food and was entitled to sale in this State when

sold under a proper label informing customers of what it is composed.

It is conceded that the use of cereal requires more water than does sausage made with meat alone. Anyone of intelligence would, upon reflection, know this to be the fact. The only doubt I entertain in the case is whether the label should, in addition to the words "with cereal," contain also "and water." In view of the fact that water is generally used in the manufacture of all sausage, and that no law or regulation of the food department has fixed the amount of water that may be used, it would seem like judicial legislation for the court to require the label to show that water is used in the manufacture. The statute does not require the label to state the proportion of the ingredients composing the mixture, but only the names of the ingredients. The statute makes special provision for butter, cheese, lard, canned fruits and vegetables, coffee, and molasses. There are other statutes governing the manufacture and sale of specific products requiring the proportions of the ingredients to be placed upon the labels, such as Act No. 123, Pub. Acts 1903. *People* v. *Harris*, 135 Mich. 136 (97 N. W. 402). It is within the power of the legislature to pass an act specifically providing for the manufacture and sale of sausage, and that the labels should state the proportions of the ingredients used. We hold a label "sausage with cereal" upon packages sold to consumers is a compliance with the statute in labeling the mixture, and a decree should be entered so stating.

The decree will be modified and a decree entered in this court in accordance with the above opinion. No costs will be allowed.

BLAIR, C. J., and MONTGOMERY, OSTRANDER, and HOOKER, JJ., concurred.