ST. LOUIS INDEPENDENT PACKING CO. v. HOUSTON, Secretary of
Agriculture, et al.

(Circuit Court of Appeals, Eighth Circuit.  May 27, 1914.)

No. 3974.

1. COURTS (§ 273*)—JURISDICTION OF FEDERAL COURTS—DEFECT OF PARTIES.

A federal court has jurisdiction to determine a suit by a packer and
manufacturer of meat food products to require the inspectors of the De-
partment of Agriculture to inspect and pass a meat product under the
provisions of Act March 4, 1907, c. 2907, 34 Stat. 1260 (U. S. Comp. St.
Supp. 1911, p. 1366), where the chief inspector in charge at the place of
suit is before the court, although the Secretary of Agriculture and Chief
of the Bureau of Animal Industry, who are also made parties defendant,
cannot be served by reason of their nonresidence.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 813;  Dec. Dig. §
273.*]

2. CONSTITUTIONAL LAW (§ 62*)—EXECUTIVE DEPARTMENTS—DELEGATION OF
POWERS—ADMINISTRATIVE RULES.

It is within the power of Congress to vest in executive officers the power
to promulgate administrative rules, but this is never deemed to extend
to the making of rules to subvert the statute.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 94–
102;  Dec. Dig. § 62.*]

3. FOOD (§ 1*)—MEAT INSPECTION ACT—CONSTRUCTION—REGULATIONS OF DE-
PARTMENT.

It was not the intention of Congress by the enactment of the Meat In-
spection Act of March 4, 1907, c. 2907, 34 Stat. 1260 (U. S. Comp. St.
Supp. 1911, p. 1361), to provide standards of quality except to prohibit
the sale of food which is unsound, unwholesome, or otherwise unfit for
human food, and to secure true branding, and the Secretary of Agricul-
ture had no power to adopt and enforce section 16 of regulation 18,
promulgated thereunder, which was added February 28, 1913, and pro-
vides that "sausage shall not contain cereal in excess of two per cent.,"
and that water or ice shall not be added to sausage in excess of 3 per
cent. if it be construed as contended by the department to prohibit the
addition of cereal or water to a greater per cent., even though their pres-
ence is stated on the label, it being shown that both cereal and water
have been used in greater per cent. in the making of sausage for many
years, and do not render it deleterious to health.

[Ed. Note.—For other cases, see Food, Cent. Dig. §§ 1, 2;  Dec. Dig.
§ 1.*

What constitutes a violation of pure food regulations, see note to Brina
v. United States, 105 C. C. A. 559.]

Amidon, District Judge, dissenting.

Appeal from the District Court of the United States for the Eastern
District of Missouri;  David P. Dyer, Judge.

Suit in equity by the St. Louis Independent Packing Company against
David F. Houston, Secretary of Agriculture, A. D. Melvin, Chief of
the Bureau of Animal Industry, and James J. Brougham, Chief In-
spector of said Bureau at St. Louis.  Complainant appeals from an
order denying a preliminary injunction.  Reversed.

For opinion below, see 204 Fed. 120.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Franklin Ferriss, of St. Louis, Mo. (J. H. Zumbalen, Henry T. Ferriss, and Matt G. Reynolds, all of St. Louis, Mo., on the brief), for appellant.

Homer Hall, Asst. U. S. Atty., of St. Louis, Mo. (Charles A. Houts, U. S. Atty., of St. Louis, Mo., and Francis G. Caffey, of New York City, on the brief), for appellee James J. Brougham.

Before HOOK and SMITH, Circuit Judges, and AMIDON, District Judge.

SMITH, Circuit Judge. This is an appeal from an order denying a preliminary injunction. Plaintiff below, appellant here, owns and operates at St. Louis, Mo., a slaughtering and packing establishment and sells its products in interstate commerce. Among these products are various combinations with sausage. Its plant and products have been under the inspection of the Department of Agriculture in pursuance of (Act June 30, 1906, c. 3913, 34 Stat. 669, 674) the meat inspection law. This portion of the act in question starts in its first subdivision with a declaration that it is for the purpose of preventing the use in interstate or foreign commerce of meat and meat products *which are unsound, unhealthful, unwholesome or otherwise unfit for human food,* and this subdivision provides for an ante mortem examination or inspection. The second subdivision provides for post mortem examinations and declares that they are for the *purposes hereinbefore set forth.* The fourth subdivision makes it the duty of the Secretary of Agriculture to inspect meat food products for the *purposes hereinbefore set forth,* and provides that his inspectors shall mark, stamp, tag, or label, as—

" 'Inspected and passed' all such products found to be sound, healthful, and wholesome, and which contain no dyes, chemicals, preservatives, or ingredients which render such meat or meat food products unsound, unhealthful, unwholesome, or unfit for human food; and said inspectors shall label, mark, stamp, or tag as 'Inspected and condemned' all such products found unsound, unhealthful, and unwholesome, or which contain dyes, chemicals, preservatives, or ingredients which render such meat or meat food products unsound, unhealthful, unwholesome, or unfit for human food."

The fifth subdivision has reference to meat and meat food products packed in any can, pot, tin, canvas or other receptacle or covering, and concludes:

"And no such meat or meat food products shall be sold or offered for sale by any person, firm, or corporation in interstate or foreign commerce under any false or deceptive name; but established trade name or names which are usual to such products and which are not false and deceptive and which shall be approved by the Secretary of Agriculture are permitted."

In the nineteenth subdivision it is provided:

"Said Secretary of Agriculture shall, from time to time, make such rules and regulations as are necessary for the efficient execution of the provisions of this act, and all inspections and examinations made under this act shall be such and made in such manner as described in the rules and regulations prescribed by said Secretary of Agriculture not inconsistent with the provisions of this act."

The Attorney General of the United States on March 24, 1913, rendered an opinion that the provisions of the pure food law (Act June 30, 1906, c. 3915, 34 Stat. 768 [U. S. Comp. St. Supp. 1911, p. 1354]) which was passed on the same day as the meat inspection law, namely, June 30, 1906, are applicable to meat and meat food products.

Without passing upon the correctness of his ruling attention is called to the following provisions of the pure food law:

"it shall be unlawful for any person to manufacture * * * any article of food or drug which is adulterated or misbranded, within the meaning of this act. * * *

"Sec. 7. That for the purposes of this act an article shall be deemed to be adulterated: * * * In the case of food: First. If any substance has been mixed and packed with it so as to reduce or lower or injuriously affect its quality or strength.

"Second. If any substance has been substituted wholly or in part for the article.

"Third. If any valuable constituent of the article has been wholly or in part abstracted. * * *

"Sec. 8. * * * * That for the purposes of this act an article shall also be deemed to be misbranded: * * * In the case of food. * * * Fourth. * * * Provided, that an article of food which does not contain any added poisonous or deleterious ingredients shall not be deemed to be adulterated or misbranded in the following cases:

"First. In the case of mixtures or compounds which may be now or from time to time hereafter known as articles of food, under their own distinctive names, and not an imitation of or offered for sale under the distinctive name of another article, if the name be accompanied on the same label or brand with a statement of the place where said article has been manufactured or produced.

"Second. In the case of articles labeled, branded, or tagged so as to plainly indicate that they are compounds, imitations, or blends, and the word 'compound,' 'imitation,' or 'blend,' as the case may be, is plainly stated on the package in which it is offered for sale."

It is provided by section 3 of the pure food act:

"That the Secretary of the Treasury, the Secretary of Agriculture, and the Secretary of Commerce and Labor shall make uniform rules and regulations for carrying out the provisions of this act."

It will be observed therefore that, while the power to make rules for the enforcement of the meat inspection law is vested exclusively in the Secretary of Agriculture, rules for the enforcement of the pure food law must be made by the Secretary of the Treasury, the Secretary of Agriculture, and the Secretary of Commerce and Labor.

Immediately upon the passage of the meat inspection law the Secretary of Agriculture promulgated a set of rules and regulations under the nineteenth subdivision of that law.

By regulation 18, subdivision 13, it was then provided:

"A meat food product that contains a substance or substances, including water, added for the purpose of adulteration and which lessens its food value shall bear a label stating that such substance or substances have been added."

At some time on or prior to April 15, 1912, the Secretary of Agriculture promulgated the following service announcement:

"Labels for meat and meat food products to which cereal, potato flour, or similar substances are, added will in the future be required to have the statements 'Cereal added,' 'Potato flour added,' etc., appear thereon in type of

such size as will be in good proportion to the name of the product, provided the product does not contain more than five per cent. of cereal, potato flour, etc. If this percentage is exceeded the words 'Cereal,' 'Potato flour,' etc., must appear as a part of the name of the product in the same size and style type and on the same line; for example, 'Sausage and Cereal,' 'Sausage and Potato Flour.'"

In the same announcement and at the same time the Secretary of Agriculture promulgated the following:

"Referring to instructions in service announcement of April 15, 1912, page 26, under the heading 'Labeling of meat and meat food products containing added substances,' attention is called to the fact that this applies to ink brands and burning brands as well as to labels, cartons, etc. Such brands should bear the statement 'Sausage and Cereal' if cereal is added in excess of 5 per cent. or 'Cereal added' if not in excess of 5 per cent."

On February 28, 1913, the Secretary of Agriculture, for the purpose of preventing the use in interstate and foreign commerce of meat or meat products under any false or deceptive name, under the authority conferred on the Secretary of Agriculture by the provisions of the act of Congress approved June 30, 1906 (34 Stat. 674), amended regulation 18 by the addition of section 16, as follows:

"Section 16. Paragraph 1. Sausage shall not contain cereal in excess of two per cent. When cereal is added its presence shall be stated on the label or on the product.

"Paragraph 2. Water or ice shall not be added to sausage, except for the purpose of facilitating grinding, chopping or mixing, in which case the added water or ice shall not exceed three per cent., except as provided in the following paragraph.

"Paragraph 3. Sausage of the class which are smoked or cooked, such as Frankfurt style, Vienna style, and Bologna style, may contain added water in excess of three per cent., but not in excess of an amount sufficient to make the product palatable. When water (in excess of three per cent.) and cereal are added to this class of sausages the statement 'Sausage, water and cereal' shall appear on the label or on the product but when no cereal is added the addition of water need not be stated."

It is against the enforcement of this new section 16 of regulation 18 that this injunction was sought.

The word "sausage" is defined by all the lexicographers as an article of food composed of meat, salt, and spices.

The bill alleges that the complainant's sausages are compounds and mixtures composed and manufactured from meat of hams, pork, spices, and cereals; that the amount of cereals used in said compounds and mixtures going to the preparation and making of said sausage is from 1 to 10 per cent. of wholesome cereal and a varying amount of pure water, depending upon the meat used and the amount necessary for the compounding and mixture of the various ingredients, and that said cereal is not an inferior substance to the other ingredients entering into the compound or mixture composing sausage, but that said material is composed of ground grain, and the sausages thus manufactured by the complainant are sound, healthful, wholesome, and contain no dyes, chemicals, preservatives, or ingredients which render such meat food products unsound, unhealthful, unwholesome, or unfit for human food. It is further alleged that the use of cereal and water as aforesaid in the manufacture of sausage is customary and necessary, and has been

universally recognized by all manufacturers thereof for more than 50 years and ever since sausages have been known as a commercial product.

The suit was brought against Honorable David F. Houston, Secretary of Agriculture, A. D. Melvin, Chief of the Bureau of Animal Industry of the Department of Agriculture, and James J. Brougham, as Chief Inspector of said Bureau, with headquarters at the city of St. Louis. The Secretary of Agriculture and the Chief of the Bureau of Animal Industry being beyond the jurisdiction of the court, service was·had only upon James J. Brougham, as Chief Inspector of said bureau.

[1] It is first contended that, as the Secretary of Agriculture and the Chief of the Bureau of Animal Industry were not found within the district where this suit was brought, and consequently were not served, the District Court had no jurisdiction to proceed to grant an injunction, and the government relies on Bogart v. Southern Pacific, 228 U. S. 137, 33 Sup. Ct. 497, 57 L. Ed. 768; and on Shields v. Barrow, 17 How. 130, 15 L. Ed. 158.

It becomes important at this point to first ascertain what was the relief prayed. Among other things the prayer was: (b) That Hon. David F. Houston, Secretary of Agriculture, Dr. A. D. Melvin, Chief of the Bureau of Animal Industry, and James J. Brougham, Chief Inspector of the Bureau of Animal Industry of the Department of Agriculture at St. Louis, defendants above named, be required by temporary mandatory injunction (to be made permanent upon a final hearing of this cause) to mark, stamp, tag, or label as "Inspected and passed" all the meat food products or sausage manufactured by your orator found to be sound, healthful, and wholesome, and which contained no dyes, chemicals, preservatives or ingredients which render said meat or meat food products unsound, unhealthful, unwholesome, or unfit for human food.

James J. Brougham being the Chief Inspector of the Bureau of Animal Industry of the Department of Agriculture at St. Louis and the one under whose charge the inspection and marking of complainant's goods must take place, the question is whether the Secretary of Agriculture or the Chief of the Bureau of Animal Industry is a necessary or indispensable party under R. S. § 737 (U. S. Comp. St. 1901, p. 587), and Judicial Code, § 50 (Act March 3, 1911, c. 231, 36 Stat. 1101 [U. S. Comp. St. Supp. 1911, p. 149]), which read:

"Sec. 50. When there are several defendants in any suit at law or in equity, and one or more of them are neither inhabitants of nor found within the district in which the suit is brought, and do not voluntarily appear, the court may entertain jurisdiction, and proceed to the trial and adjudication of the suit between the parties who are properly before it; but the judgment or decree rendered therein shall not conclude or prejudice other parties not regularly served with process nor voluntarily appearing to answer; and nonjoinder of parties who are not inhabitants of nor found within the district, as aforesaid, shall not constitute matter of abatement or objection to the suit."

And rule 39 (198 Fed. xxix, 115 C. C. A. xxix) of the new equity rules as follows:

"In all cases where it shall appear to the court that persons, who might otherwise be deemed proper parties to the suit, cannot be made parties by rea-

son of their being out of the jurisdiction of the court, or incapable otherwise of being made parties, or because their joinder would oust the jurisdiction of the court as to the parties before the court, the court may, in its discretion, proceed in the cause without making such persons parties; and in such cases the decree shall be without prejudice to the rights of the absent parties."

We think that under the statute and rule there is no doubt that jurisdiction existed in this case.

A case on a similar subject to that here involved was before the Supreme Court of Michigan in Armour & Co. v. Bird, 159 Mich. 1, 123 N. W. 580, 25 L. R. A. (N. S.) 616. In that case the court said:

"The following facts are admitted or established beyond controversy: (a) The sausage manufactured by the complainant is a wholesome article of food. It contains nothing deleterious to health. (b) It is a mixture or compound within the meaning of the proviso in the statute above quoted, being composed of meat, cereal, salt, and spices. (c) It is made in accordance with the act of Congress and directions prescribed thereunder by the Commissioner of Agriculture, and under the inspection of the United States Inspectors. (d) Sausage is made of different kinds of meat, viz., pork, beef, and veal. Whether manufactured for interstate commerce or domestic use within the state, it is sometimes made with cereal, and sometimes without it. Cereal is not a necessary ingredient to its manufacture, although it has been used by most manufacturers for many years. (e) Water is an essential ingredient in the manufacture of sausage, whether made with or without cereal. This is shown by the evidence of the defendants. One of their witnesses, with an experience of 35 years, testified: 'In the manufacture of pork sausage we use pork, and, if the pork is a little too fat, we put in some veal or beef. It is necessary to have a little water added, a quart and a half to 100 pounds. It is pretty hard to make them without. We use a little more water than would be found in the meat when freshly killed.' Another, who has been engaged in the manufacture of sausage since 1864, testified: 'I put a little water in pork sausage. I use from 5 to 10 pounds of water to 100 pounds of meat. Enough to make it pliable, that is all. I use from 8 to 10 pounds of water in making beef sausage. I presume you could make sausage without water, but you could not stuff it very well.' Another, who learned to make sausages in Germany, testified: 'I have always used water, and still use water in the manufacture of sausage. Water is necessary. They use water in making sausage in Germany. So far as I know, every one used it.' The United States regulations require that the water used shall be pure. (f) It is not in violation of definitions 4 and 7 of the act. It does not violate definition 7, because it contains no substance or ingredient poisonous or injurious to health. It does not violate definition 4, because meat is the basis and principal ingredient of the article. As manufactured by complainant, it contains from 2 to 10 per cent. of cereal. It is and has been for more than 40 years recognized in the trade as sausage. When sold as sausage with cereal added, it deceives no one, is not an imitation, and manufacturers are entitled to manufacture and label it as sausage with cereal. It is not contended that manufacturers have not the right to use the name 'sausage' when sold with a proper label. The federal statute is practically identical with that of Michigan, and contains a proviso reading: 'That an article of food which does not contain any added poisonous or deleterious ingredients shall not be deemed to be adulterated or misbranded in the following cases: First. In the case of mixtures or compounds which may be now or from time to time hereafter known as articles of food under their own distinctive names, and not an imitation of or offered for sale under the distinctive name of another article, if the name be accompanied on the same label or brand with a statement of the place where said article has been manufactured or produced.' * * * Acting under this law, the Department of Agriculture, on September 12, 1906, adopted the following regulation: 'Sausages and Chopped Meats. The word "sausage" without a prefix indicating the species of animal is considered to be a mixture of minced or chopped meats with or without spices. If any

species of animal is indicated as pork sausage, the sausage must be wholly made from the meat of that species. If any flour or other cereal is used the label must so state. If any other meat product is added, the label must so state.' To this regulation the department added: 'Manufacturers are warned that the above rulings do not exempt them from the enforcement of state laws.' The learned circuit judge in his opinion found that sausage manufactured as is that of the complainant 'is probably as healthy as pure sausage such as was known to the fathers.' * * * 'Sausage' is defined by all the lexicographers as an article of food composed of meat, salt, and spices. See Worcester's and Century Dictionaries. The people generally so understand it. The writer of this opinion would be compelled to admit that until very recently he had no knowledge that cereal was used in the manufacture of sausage. * * * The consumer who prefers sausage made of meat alone is entitled to be informed that he is buying such an article. The consumer who prefers sausage mixed with cereal is entitled to know that he is purchasing that article. * * * The use of cereal in the manufacture of sausage has been very general. The State Food and Dairy Commissioner of Iowa, who at the time of the hearing below had held office for five years, testified to its general use in that state, stating that 'the ingredients used by the Iowa manufacturers in making sausage are chopped meats, salt, spices, flour, and sufficient water.' "

In view of the statements made by the Supreme Court of Michigan we are the more inclined to believe the allegation of the bill of complaint that it has been the practice for 50 years to compound in the preparation of sausages, so-called, some cereals. It is stated by the Supreme Court of Michigan that it appears to be established by the evidence that sausage made with cereal is sold cheaper than that made of meats alone.

[2] It was in apparent knowledge of this history that the early regulations of the Department of Agriculture were promulgated on this subject. It is within the power of Congress to vest in executive officers the power to promulgate administrative rules, but this never is deemed to extend to the making of rules to subvert the statute. Williamson v. United States, 207 U. S. 425, 28 Sup. Ct. 163, 52 L. Ed. 278; United States v. United Verde Copper Co., 196 U. S. 207, 25 Sup. Ct. 222, 49 L. Ed. 449; Morrill v. Jones, 106 U. S. 466, 1 Sup. Ct. 423, 27 L. Ed. 267; United States v. Grimaud, 220 U. S. 506, 31 Sup. Ct. 480, 55 L. Ed. 563; Leecy v. United States, 190 Fed. 289, 111 C. C. A. 254.

[3] The entire meat inspection law (Act March 4, 1907, c. 2907, 34 Stat. 1260 [U. S. Comp. St. Supp. 1911, p. 1366]) was, as distinctly indicated in it, to prevent the sale of food which is unsound, unwholesome, or otherwise unfit for human use or misbranded. It was not the design of Congress in that law to provide standards of quality except to prohibit the sale of food which was unsound, unwholesome, or otherwise unfit for human use and secure true branding. The article in question, being sausage with cereal or sausage and cereal, was not intended to be prohibited by Congress. The act of Congress did contemplate, however, that the purchaser should know what he was buying. The early regulations of the Department of Agriculture were in strict accordance with the statute, and, nowithstanding the fact that it had been the practice in compounding sausage for many years at that time to mix cereal and the great quantities of water which it would absorb, that fact was not generally known outside of the trade, and can-

not be presumed to have been known by Congress. If such combination was sold as sausage it might be said to be sold under a false or deceptive name as prohibited by the meat inspection law, and, it might be said that another substance had been mixed and packed with it so as to lower or injuriously affect its quality or strength and that a substance had been substituted wholly or in part for the article as prohibited in the pure food law, but when sold as sausage with cereal or as sausage and cereal none of these provisions would apply.

We come now to the provision inserted in section 16 of rule 18 that sausage shall not contain cereal in excess of 2 per cent. If this simply means that it shall not be sold as sausage, it possibly may have been valid, but the government does not contend that this is its true meaning. If it meant that sausage sold as such should not contain cereal in excess of 2 per cent., but that sausage and cereal might contain more, it might be sustained. But the contention is that the Secretary of Agriculture had power to prohibit the manufacture and sale of sausage and cereal where the cereal was in excess of 2 per cent. This the Secretary of Agriculture had no power to do. Basing all our statements upon the allegations of the bill, which have never been controverted, sausage and cereal which contain no dyes, chemicals, preservatives or ingredients which render such meat or meat food product unsound, unhealthful, unwholesome, and unfit for human food and which is not by any other reason unsound, unhealthful, unwholesome, or unfit for human food, is not subject to condemnation under the meat inspection law except as hereafter indicated.

It is claimed that the power existed to pass this regulation under the last portion of the fifth subdivision of the meat inspection law, but this is an error. The subdivision in question prohibits a sale under any false and deceptive name and such it probably would be to sell a combination of sausage and cereal under the name of sausage, but not under the name of sausage and cereal. The section then continues:

"But established trade name or names which are usual to such products and which are not false and deceptive and which shall be approved by the Secretary of Agriculture are permitted."

What is meant by trade name or names? The answer to this question will be at once apparent to students of the law of trade-marks, trade-names, and unfair competition.

"Trade-names have been frequently confused with trade-marks, and, broadly considered, they do include names which may constitute technical trade-marks. More accurately, however, trade-names are names which are used in trade to designate a particular business of certain individuals considered somewhat as an entity, or the place at which a business is located, or of a class of goods, but which are not technical trade-marks either because not applied or affixed to goods sent into the market, or because not capable of exclusive appropriation by any one as trade-marks. Such trade-names may, or may not, be exclusive. Exclusive trade-names are protected very much upon the same principles as trade-marks, and the same rules that govern trade-marks are applied in determining what may be an exclusive trade-name. Nonexclusive trade-names are names that are publici juris in their primary sense, but which in a secondary sense have come to be understood as indicating the goods or business of a particular trader. Trade-names are acquired by adoption and user, and belong to the one who first used them and gave them a value." 38 Cyc. 764; Cady v. Schultz, 19 R. I. 193, 32 Atl. 915,

29 L. R. A. 524, 61 Am. St. Rep. 763; Fairbank Co. v. Luckel, K. & C. Soap Co., 102 Fed. 327, 42 C. C. A. 376; Millspaugh Laundry v. First Nat'l Bank, 120 Iowa, 1, 94 N. W. 262.

It is such trade-names that the Secretary of Agriculture must approve. As illustrations of trade-names of meat if not trade-marks, take "Premium," "Empire," "Star," "Shield," "Diamond C," "Rex," "Supreme," "Coupon." These are doubtless legitimate trade-names, but if lard should be marked "Pure Premium Leaf Lard" and it should appear that it was not pure, or was only a part from the leaf, this would be false and deceptive and could be rejected by the Secretary of Agriculture although a trade-name. But the Secretary of Agriculture has nothing to do with the name of an article so long as it is not false and deceptive. Beef, pork, veal, quarters, ribs, sausage, and the like are common nouns which are names indicative from what animal or what part of the animal or how the article is made, and, so long as not false or deceptive, the Secretary of Agriculture has no right to object to their use.

It is claimed by the government that the rule simply prevents the product from being stamped by the government as "Inspected and passed," and that plaintiffs can manufacture sausage and cereal and sell it in interstate commerce without this stamp, but this seems to be an error. The law contemplates that, as before stated, an ante mortem examination of the animal, a post mortem examination of the carcass, and in the fourth subdivision an examination of meat food products and their being "Passed" or "Condemned." This combination of meat and cereal is a "meat food product" as this term is used, and it must be inspected and passed or condemned. There is no branch of the packing business which so imperatively requires inspection as that of the making of sausage and kindred articles. The law requires that they be inspected and passed or condemned, and provides that the inspector may be withdrawn from any plant that does not destroy any condemned meat food product for use as food.

We are not required to pass and will not pass upon whether the Secretary of Agriculture could expand the old regulation so as to require the manufacturer to show what amount or per cent. of cereal and water is used.

The question is simply, Could he prohibit the making of a compound which was sound, healthful, wholesome, and free from dyes, chemicals, preservatives, or ingredients which render such unfit for human food by a mere regulation? We are constrained to say that he cannot. A compound of beef and pork would not entitle the Secretary of Agriculture to prohibit the words "beef" and "pork" to appear in the title and to condemn all such compounds on the label of which they appear.

Slightly similar to this is the case of the United States v. Eleven Thousand One Hundred and Fifty Pounds of Butter, 195 Fed. 657, 115 C. C. A. 463.

The government has cited, since the submission United States v. Antikamnia Chemical Co., 231 U. S. 654, 34 Sup. Ct. 222, 58 L. Ed. 419, but we find nothing in it conflicting with our position, but much that sustains it.

It follows that the case is reversed and remanded, with directions to issue an injunction restraining the Chief Inspector of the Bureau of Animal Industry in charge of plaintiff's plant from refusing to mark complainant's product as "Inspected and passed" upon the ground that it contains cereal in excess of 2 per cent. or water in excess of 3 per cent., so long as it is marked "Cereal added," or "Sausage and Cereal," as now or hereafter required by regulation of the Secretary of Agriculture, and if the Secretary of Agriculture shall hereafter require that the product shall be marked "Water added," or with the amount of water added, the preliminary decree shall be subject to be modified accordingly.

AMIDON, District Judge, dissents.