PEOPLE *v.* DEHN.

1. CONSTITUTIONAL LAW—FOOD—FRAUD—ADULTERATION—SAUSAGE.
   Under Act No. 151, Pub. Acts 1913, 2 Comp. Laws 1915, §
   6509 *et seq.*, the title, "An act providing for the protection
   of the public health and the prevention of fraud and de-
   ception, by prohibiting the sale, the offering for sale or
   exposing for sale or the having in possession with in-
   tent to sell, of adulterated or deleterious sausage; defining
   sausage; and prescribing the penalty for the violation
   thereof," sufficiently complied with the constitutional re-
   quirements to include the offense of selling sausage con-
   taining more than 2 per cent. of cereal.

2. SAME—POLICE POWER—EXTENT.
   The police power of a State embraces its whole system of
   internal regulation by which the State seeks not only to
   preserve the public order and to prevent offenses against
   the State, but also to establish for the intercourse of cit-
   izens with citizens those rules of good manners and good
   neighborhood which are calculated to prevent a conflict of
   rights and to insure to each the uninterrupted enjoyment
   of his own; it is ·but another name for that authority
   which resides in every sovereignty to pass all laws for
   the internal regulation and government of the State.

3. CRIMINAL LAW—FOODS—SAUSAGE—DEFINITION.
   Sausage is an article of food composed of meat, salt and
   spices.

4. CONSTITUTIONAL LAW—SALE—FOOD LAW—SAUSAGE.
   And an enactment forbidding the sale of sausage contain-
   ing more than two per cent. of cereal is not invalid be-
   cause it exceeds the police power of the legislature, where
   it was designed merely to prevent fraud or deception, not
   to prohibit the sale of ·a deleterious article.[1]

Exceptions before sentence from Bay; Collins, J.
Submitted October 28, 1915.   (Docket No. 134.)   De-
cided January 3, 1916.

[1]As to what constitutes adulteration within the food and drug
act, see note in L. R. A. 1915B, 774.

Carl Dehn was convicted of selling adulterated sausage, upon a verdict directed by the court. Affirmed.

*James L. McCormick,* Prosecuting Attorney, for the people.

*Charles W. Hitchcock* and *De Foe, Hall & Converse,* for respondent.

MOORE, J. The respondent is charged with violating the provisions of Act No. 151, Pub. Acts 1913, in that he did—

"offer for sale, and did sell to James E. Helber, a certain quantity of sausage, to wit, one quarter pound which said sausage was then and there adulterated within the meaning of Act 151 of the Public Acts of the State of Michigan for the year 1913, said sausage then and there containing added cereal or vegetable flour exceeding 2 per centum, to wit, 6.22 per centum, contrary to the provisions of the act aforesaid."

After the testimony on the part of the people, and part of the testimony on the part of respondent was in, it was admitted by respondent that he sold sausage as charged in the information, containing more than 6 per cent. of cereal, and claimed the right to do so for reasons that will appear later. The trial judge directed the jury to bring in a verdict of guilty, and after returning to the jury room they did so. The case is here on exceptions before sentence.

It was claimed below that respondent should have been discharged:

*First,* because said Act No. 151, Pub. Acts 1913, upon which said information is based, is unconstitutional and void for the following reasons: (*a*) Because the title to said act is not broad enough to include the offense so complained of; (*b*) because the provisions of said act prohibiting the sale of sausage containing vegetable flour or cereal in excess of 2 per cent. is contrary to the provisions of section 16 of article 2 of the Constitution of this State providing that

no person shall be deprived of life, liberty, or property without due process of law; (c) because the aforesaid provisions of said law are contrary to the fourteenth amendment of the Constitution of the United States; (d) because said act prescribes a cruel and unusual punishment and excessive fine, contrary to the provisions of section 15 of article 2 of the Constitution of the State; (e) because the provisions of said act are uncertain and indefinite, in that it is impossible to determine from said act whether the per cent. of cereal is to be by weight or volume.

(a) The title of Act No. 151, Pub. Acts 1913 (2 Comp. Laws 1915, § 6509 *et seq.*), reads:

"An act providing for the protection of the public health and the prevention of fraud and deception, by prohibiting the sale, the offering for sale or exposing for sale or the having in possession with intent to sell, of adulterated or deleterious sausage; defining sausage; and prescribing the penalty for the violation hereof."

The provisions of the act material here are as follows:

"SECTION 1. It shall be unlawful for any person or persons, by himself, herself or themselves, or by his, her or their agents, servants or employees, to sell, offer for sale, expose for sale, or have in possession with intent to sell, sausage that is adulterated within the meaning of this act. Sausage when used in this act shall be deemed to include bologna, wiene-wurst and frankforts.

"SEC. 2. For the purpose of this act, sausage or sausage meat shall be held to be a comminuted meat from neat cattle or swine, or a mixture of such meats, either fresh, salted, pickled or smoked, with added salt and spices, and with or without the addition of edible animal fat, blood and sugar, or subsequent smoking. It shall contain no larger amount of water than the meats from which it is prepared contain when in their fresh condition.

"SEC. 3. For the purpose of this act, sausage shall be deemed to be adulterated:

"*First*, if it contains added water in excess of the

quantity required to bring the amount up to that which the meats from which it is prepared contain immediately after slaughter;

"*Second,* if it contains any cereal or vegetable flour, * * *

"Nothing in this act shall be construed as prohibiting the sale of sausage which when properly labeled shall conform to the following standard: Sausage shall not contain cereal in excess of two per cent. When cereal is added its presence shall be noted on the label or on the product. * * *

"SEC. 4. Any person who shall violate any of the provisions of this act shall be guilty of a misdemeanor, and upon conviction thereof shall be sentenced to pay a fine of not less than one hundred dollars, nor more than two hundred dollars, or to undergo an imprisonment of not less than thirty days, nor more than sixty days, or both or either, in the discretion of the court."

The sufficiency of the title to acts to justify the provisions of the acts under them has been before this court repeatedly. See *People* v. *Grocer Co.,* 118 Mich. 604 (77 N. W. 315); *People* v. *Rotter,* 131 Mich. 250 (91 N. W. 167). We think the title sufficient.

"B" and "C" may be considered together. The testimony is to the effect that the cereal used was a healthful article of food, and it is argued by counsel that the legislature is not authorized to prevent the sale of such food. We quote from the brief:

"This case therefore presents the question * * * as to whether or not the legislature of this State can prohibit the sale of a wholesome, nutritious, and non-injurious article of food. We have no complaint of those provisions of the statute which require sausage to be labeled when cereal is used; that to our mind is a wise and proper provision and if followed, will be ample protection to the public. * * * It is our contention that if the consumer prefers sausage made with cereal, or if he can afford to buy it when so made and not when manufactured of meat alone, or if the condition of his health will not permit him to eat sausage when made of pure meat, the legislature has no right and no power, under the Constitution of this State, to

deprive that person of his right to purchase this wholesome article of food, nor to interfere with the business of the manufacturer in supplying this demand."

Counsel for appellant cite in support of their contention *Armour* v. *Dairy & Food Com'r*, 159 Mich. 1 (123 N. W. 580, 25 L. R. A. [N. S.] 616); *People* v. *Biesecker*, 169 N. Y. 53 (61 N. E. 990, 57 L. R. A. 178, 88 Am. St. Rep. 534); *Schollenberger* v. *Pennsylvania*, 171 U. S. 1 (18 Sup. Ct. 757); *State* v. *Hanson*, 118 Minn. 85 (136 N. W. 412, 40 L. R. A. [N. S.] 865, Am. & Eng. Ann. Cas. 1913E, 405; *Collins* v. *New Hampshire*, 171 U. S. 30 (18 Sup. Ct. 768); *St. Louis, etc., Packing Co.* v. *Houston*, 215 Fed. 553 (132 C. C. A. 65); and other authorities found in the brief. An examination of these cases will show they are not controlling of the case before us.

The record discloses that the sausage was sold in this instance for 15 cents a pound, that the cereal that goes into its manufacture costs 3½ or 4 cents a pound, and that a pound of the cereal usually absorbs from 1 1/10 pounds to 2 1/5 pounds of water. It is evident that if respondent may legally use 6 per cent. of cereal, he may use 10 or 20 per cent., or any proportion which, in his judgment, can be mixed with the other ingredients without destroying the demand for his product. It is not claimed by the people that the cereal added to the meat made a product deleterious to health, but that it does lower the value of the sausage, and is a deception and fraud upon the purchaser, and that to avoid such a result the State has in the exercise of the police power the right to fix food standards, and that in the passage of the pure food law it is well within its rights. Courts recognize the difficulty of defining the police power of the State. It is, however, a power which will adapt itself to the constantly changing conditions of life. In 6 R. C. L., at page 186, it is said:

"Judge Cooley says that the police power of a State 'embraces its whole system of internal regulation, by which the State seeks, not only to preserve the public order and to prevent offenses against the State, but also to establish for the intercourse of citizens with citizens those rules of good manners and good neighborhood, which are calculated to prevent a conflict of rights, and to insure to each the uninterrupted enjoyment of his own so far as is reasonably consistent with a like enjoyment of rights by others,' and the courts have quoted this definition with approval many times. It has also been stated that the police power is but another name for that authority which resides in every sovereignty to pass all laws for the internal regulation and government of the State, and that it comprises that portion of the sovereignty of the State which was not surrendered by the terms of the Federal Constitution to the central government. Finally, it has been said that by means of this power the legislature exercises a supervision over matters involving the common weal, and enforces the observance, by each individual member of society, of the duties which he owes to others and to the community at large."

In the same authority at page 208 it is said:

"The police power of the State is not limited to regulations necessary for the preservation of good order or the public health and safety. The prevention of fraud and deceit, cheating and imposition, is equally within the power, and a State may prescribe all such regulations as in its judgment will secure, or tend to secure, the people against the consequences of fraud, such as the prohibition of the sale of deceitful imitations of articles of food in general use, the requirement that goods sold should bear labels showing the ingredients, or the regulation of weights and measures, prohibiting the use of coloring matter in articles of food, e. g., substitutes for butter, whereby purchasers might be deceived into believing that they were purchasing a genuine article, the regulation of the size of loaves of bread, and the prevention of deception as to the character or quality of goods offered for sale. * * * In general it may be said that a State may institute any reasonable preventive remedy required by

the frequency of fraud, or the difficulty experienced by individuals in circumventing it, especially when other means have not proved to be efficacious."

In *Armour & Co.* v. *Dairy and Food Com'r*, 159 Mich., at page 10 (123 N. W. 583, 25 L. R. A. [N. S.] 616), it is said:

" 'Sausage' is defined by all the lexicographers as an article of food composed of meat, salt, and spices. See Worcester's and Century Dictionaries. The people generally so understand it. The writer of this opinion would be compelled to admit that until very recently he had no knowledge that cereal was used in the manufacture of sausage."

In *St. Louis, etc., Packing Co.* v. *Houston*, 215 Fed., at page 556 (132 C. C. A. 68), it is said:

"The word 'sausage' is defined by all the lexicographers as an article of food composed of meat, salt, and spices"

—and we think it might be added that until recently the average purchaser of food would expect to get a product composed only of those articles if he inquired for sausage. In this connection the language of Justice Hooker in *People* v. *Rotter*, 131 Mich. 250 (91 N. W. 167), is helpful:

"Butter is a well-known commodity. From time immemorial it has had but one origin, viz., from the churning of milk or cream. Whatever may be said of the possibility of making a product from other compounds than milk or cream that shall closely resemble or be chemically identical with butter, the world has but one understanding of what is meant by the word 'butter,' and we must assume that such is the sense in which our legislature used the term. 1 Comp. Laws, § 50, subd. 1. A fair inference from this statute is that the legislature undertook to prevent deception by preventing the sale of any yellow oleomargarine, and it undertook to accomplish this by the most effective means, viz., by prohibiting the coloring of oleomargarine yellow, thereby avoiding the embarrassment

which would otherwise arise from the necessity of proving in each case that deceit was used in selling it as and for butter."

In *State* v. *Ice Cream Co.*, 168 Iowa, 1, 17 (147 N. W., at page 201), it is said:

"We are not to say, and do not, of course, determine, that these defendants, or the association appearing in argument, or any particular person, is or has been guilty of any fraud or deception. The question is whether, without a standard, dishonest or unscrupulous manufacturers may do so. It is not practicable by any ordinary inspection for the purchaser to distinguish cheaper, low-grade ice cream from the better quality. Because of this, it is apparent from the matters which we have detailed that an opportunity is afforded for deception by selling an inferior quality of ice cream at the price of a better or more expensive grade. This was the case in the sale of oleomargarine. *State* v. *Packing Co.*, 124 Iowa, 323 [100 N. W. 59, 2 Ann. Cas. 448]. * * * The purpose of the act in question was to prevent just such deception and fraud as would be possible without a standard, and it seems to us it cannot be seriously claimed that the statute will not accomplish the end sought."

In *State* v. *Campbell*, 64 N. H. 402 (13 Atl. 585, 10 Am. St. Rep. 419), occurs the following:

" 'But the defendant takes the broader ground that the legislature cannot, under the Constitution, prohibit the sale of milk drawn from healthy cows which in its natural state falls below the standard fixed by the acts, unless such milk, or the article made from it, is in fact unwholesome or dangerous to public health.' * * * The difficulty of guarding against the adulteration of milk may have influenced the legislature in fixing a standard of richness. Practically it makes no difference whether milk is diluted after it is drawn from the cow, or whether it is made watery by giving her such food as will produce milk of an inferior quality, or whether the dilution, regarded by the legislature as excessive, arises from the nature of a particular animal or a particular breed of cattle. The sale

of such milk to unsuspecting consumers for a price in excess of its value is a fraud which the statute was designed to suppress. It is a valid exercise by the legislature of the police power for the prevention of fraud and the protection of the public health, and as such is constitutional."

In *State* v. *Creamery Co.*, 83 Minn. 284 (86 N. W. 107, 54 L. R. A. 466, 85 Am. St. Rep. 464), it is said:

"The defendant claims that this statute, in so far as it prohibits the sale of cream solely because it contains less than 20 per centum of fat, is unconstitutional, because it is unreasonable and not a proper exercise of the police power, is based upon an arbitrary classification, and is special legislation, and is an unlawful restraint of trade, and illegally restricts the citizen's right to contract and to pursue a lawful calling, and deprives him of his liberty and property without due process of law.

"The section of the statute in question is a part of the general statutes of the State, which were enacted to prevent deception in the sale of dairy products, and its obvious purpose is to fix a standard for cream, and forbid the sale of any cream, as such, which is below the prescribed standard, whereby unsuspecting purchasers may be defrauded. It must be, and is, construed so as to effectuate such purpose. We accordingly hold that the statute in question forbids, and only forbids, the sale of cream, as such, which is below the prescribed standard. So construed, the statute is a proper exercise of the police power of the State, and is valid. Its constitutionality rests upon the same principles as does the validity of statutes prohibiting the sale of milk unless it contains a prescribed percentage of fat and solids, and other similar statutes. The constitutionality of such statutes has been uniformly sustained. *Butler* v. *Chambers*, 36 Minn. 69 (30 N. W. 308, 1 Am. St. Rep. 644, and notes); *Commonwealth* v. *Evans*, 132 Mass. 11; *State* v. *Smyth*, 14 R. I. 100 [51 Am. Rep. 344]; *State* v. *Campbell*, 64 N. H. 402, 13 Atl. 585 [10 Am. St. Rep. 419]; *City* v. *Cook*, 38 Mo. App. 660. Counsel for the defendant, while practically conceding the validity of statutes fixing a standard for milk, and forbidding the

sale of milk below such standard, seek to distinguish such statutes from statutes of the character of the one we are considering, for the reason that:

"'Cream is a natural product, and, when not diseased or impure, is not only harmless, but beneficial as food and for many other purposes, whether it contains 10 per cent. of fat or 35 per cent. of fat. It is commonly known that there is no practice of adulterating cream as there is in the case of milk, nor of simulating it as in the case of butter, and that pure cream is wholesome, though it contains less than 20 per centum of fat.'

"We cannot take judicial knowledge of the supposed facts thus asserted; for if this is a matter in which we are required to take judicial notice of the facts, we know that it is entirely feasible to mix pure cream with a limited amount of milk, and produce a mixture which may be sold to the inexperienced as pure cream. Undoubtedly there is less necessity for a statute to prevent deception in the sale of cream than there is of one to prevent fraud in the sale of milk, because the latter may be classed as a necessity, and the former as a luxury, and its sale not as general as that of milk; but the distinction is one of degree, not of principle. In either case the legislature is the sole judge of the necessity and propriety of preventing deception in the sale of the article, by appropriate legislation. *Powell* v. *Pennsylvania,* 127 U. S. 678, 8 Sup. Ct. 992, 1257 [32 L. Ed. 253]. And the legislature, by this statute, having, in the exercise of the police power, fixed a standard for all cream to be sold as such, the act is valid."

In the case of *People* v. *Grocer Co.,* 118 Mich. 604 (77 N. W. 315), this court sustained a law fixing the standard ingredients of vinegar as a proper exercise of the police power, saying, in effect, that if it is contended the standard fixed is unreasonable, the question might very properly be addressed to the legislature. See, also, *City of St. Louis* v. *Reuter,* 190 Mo. 514 (89 S. W. 628) ; *People* v. *Girard,* 145 N. Y. 105 (39 N. E. 823, 45 Am. St. Rep. 595) ; *Commonwealth* v. *Evans,* 132 Mass. 11.

We think the legislation was within the police power.

We have considered the other assignments of error, and deem them not well taken.

The conviction is affirmed, and the case is remanded for further proceedings.

STONE, C. J., and KUHN, OSTRANDER, BIRD, STEERE, BROOKE, and PERSON, JJ., concurred.