ST. LOUIS INDEPENDENT PACKING CO. v. HOUSTON, Secretary of
Agriculture, et al.

(Circuit Court of Appeals, Eighth Circuit. May 7, 1917.)

No. 4692.

1. Food ☞3—Meat Inspection Act—Construction—Regulations of De-
partment.

The provision of Order No. 211, promulgated by the Secretary of Agri-
culture under Meat Inspection Act March 4, 1907, c. 2907, 34 Stat. 1260,
and effective November 1, 1914, that sausage shall not contain cereal in
excess of 2 per cent., nor water in excess of 3 per cent., if construed to
include any compound or mixture, however labeled, as contended by the
Department, is not within the power conferred on the Secretary to make
regulations to carry out the purposes of the act; such purposes being to
prohibit generally the sale of products which are unsound, unwholesome,
or otherwise unfit for human food, or misbranded, without prescribing
formulas for such products.

[Ed. Note.—For other cases, see Food, Cent. Dig. § 2.]

2. Constitutional Law ☞74—Acts of Administrative Officers—Review
by Courts.

Where the head of a department is not acting for the executive, but in
the performance of a duty specifically imposed upon him by a law of Con-
gress, whether his acts, where they affect individual rights are within the
powers conferred, is a question which the courts have jurisdiction to de-
termine.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 124.]

Amidon, District Judge, dissenting.

Appeal from the District Court of the United States for the Eastern
District of Missouri; David P. Dyer, Judge.

Suit in equity by the St. Louis Independent Packing Company
against David F. Houston, Secretary of Agriculture, A. D. Melvin,
Chief of the Bureau of Animal Industry, and James J. Brougham,
Chief Inspector of such Bureau at St. Louis. Decree for defendants,
and complainant appeals. Reversed.

For opinion below, see 231 Fed. 779. See, also, 215 Fed. 553, 132
C. C. A. 65.

Franklin Ferriss, of St. Louis, Mo. (A. B. Stratton, of Chicago, Ill.,
on the brief), for appellant.

W. H. Woodward, Asst. U. S. Atty., of St. Louis, Mo. (Arthur L.
Oliver, U. S. Atty., of St. Louis, Mo., on the brief), for appellees.

Before SANBORN and SMITH, Circuit Judges, and AMIDON,
District Judge.

SMITH, Circuit Judge. This suit was brought to obtain a tempo-
rary and permanent injunction "restraining Hon. David F. Houston,
Secretary of Agriculture, Dr. A. D. Melvin, Chief of the Bureau of
Animal Industry, and James J. Brougham, Chief Inspector of the Bu-
reau of Animal Industry of the Department of Agriculture at
St. Louis, and their and each of their assistants, deputies, inspectors,
employés, representatives, and clerks, from refusing to mark, stamp,

tag, or label as 'Inspected and Passed' all meat food products or sausage manufactured by your orator found to be sound, healthful, and wholesome, and which contain no dyes, chemicals, preservatives, or ingredients which render such meat or meat food products unsound, unhealthful, unwholesome, or unfit for human food," and that a mandatory injunction issue requiring the defendants to "mark, stamp, tag, or label as 'Inspected and Passed' all the meat food products or sausage manufactured by your orator found to be sound, healthful, and wholesome, and which contain no dyes, chemicals, preservatives, or ingredients which render said meat or meat food products unsound, unhealthful, unwholesome, or unfit for human food."

, Upon application to the District Court for a temporary injunction, it was denied, and complainant appealed, and the District Court was reversed, and a temporary writ of injunction ordered issued. St. Louis Independent Packing Co. v. Houston, 215 Fed. 553, 132 C. C. A. 65. We assume that upon receipt of the mandate a temporary injunction was issued by the District Court in accordance with our order, although that fact does not appear in the record. No notice was ever had upon Dr. A. D. Melvin, and he did not appear. Hon. David F. Houston, Secretary of Agriculture, and James J. Brougham, inspector in charge, filed separate answers in substantially the same form, the former on January 21, 1915. The case came on for trial at the September term, 1915, as between the complainants and the defendants answering, and upon the evidence the District Court on March 20, 1916, dismissed the bill at complainant's cost, and it appeals. The opinion of the District Court upon the application for a temporary injunction will be found in 204 Fed. 120, and its opinion upon final hearing, upon which its decree was reached from which this appeal was taken, is found in 231 Fed. 779. The case having been three times reported, we shall not make a full statement of the issues and evidence, but content ourselves with stating such new matters as will be necessary to an understanding of the case, leaving the history of it to be learned from the former opinions.

The appellees earnestly urge a change in our rulings on the former appeal, 215 Fed. 553, 132 C. C. A. 65. This we cannot consider. The former opinion constituted the law of the case. The authorities upon this are so numerous that we cannot cite them individually. They will be found fully reviewed and cited in 2 Enc. of U. S. Sup. Ct. Repts. 412 to 415, and 12 Enc. of U. S. Sup. Ct. Repts. 142. In view, however, of the fact that the Secretary of Agriculture had not been served prior to the time of the former appeal, although his subordinate had been, we concede it is barely possible this rule does not apply to him. We therefore say that the argument in support of a change in our former rulings is not persuasive and the rulings are adhered to.

Notwithstanding its somewhat inaccurate statement in the bill, complainant has not been manufacturing sausage, but a compound which is embraced in the term "meat food products" and known as "sausage and cereal." Water is added, and the power of the Agricultural Department to compel the use of the word "water" in the name of the compound has never been questioned. Thus it can require that plain-

tiff's product be labeled "sausage, cereal and water," if it deems such conduct proper, and it could even require that the label show the percentage of each article used. These meat food products have been marked for years by stamping upon every link of the sausage in large link goods the words "sausage and cereal." Where the links are very small, this has been put upon every third to fifth link. The same inscription is put upon the ten-pound cartons of shipment; but, as this does not reach the ultimate consumer, it will for the present be ignored.

[1] It affirmatively appears that the complainant's manufacture contains no dyes, chemicals, preservatives, or ingredients that would render them unsound, unhealthy, unwholesome, or unfit for human food. The sole question on this branch of the case is whether cereal in excess of 2 per cent. or water in excess of 3 per cent. may be added to sausage not to be sold as sausage, but to be sold as sausage and cereal, or under such other name as the Secretary of Agriculture may prescribe, not, however, denying the right to use the word "sausage." When the practice of mixing cereal with sausage commenced in this country, the cereal was higher priced than the meat. One government witness stated that the mixture of cereal with sausage made the compound less speedy of digestion.

Let us now see what was decided on the former appeal. It was there said:

"The entire Meat Inspection Law (Act March 4, 1907, c. 2907, 34 Stat. 1260 [U. S. Comp. St. Supp. 1911, p. 1366]) was, as distinctly indicated in it, to prevent the sale of food which is unsound, unwholesome, or otherwise unfit for human use or misbranded. It was not the design of Congress in that law to provide standards of quality, except to prohibit the sale of food which was unsound, unwholesome, or otherwise unfit for human use, and secure true branding. The article in question, being sausage with cereal, or sausage and cereal, was not intended to be prohibited by Congress. The act of Congress did contemplate, however, that the purchaser should know what he was buying. * * * We come now to the provision, inserted in section 16 of rule 18, that sausage shall not contain cereal in excess of 2 per cent. If this simply means that it shall not be sold as sausage, it possibly may have been valid; but the government does not contend that this is its true meaning. If it meant that sausage sold as such should not contain cereal in excess of 2 per cent., but that sausage and cereal might contain more, it might be sustained. But the contention is that the Secretary of Agriculture had power to prohibit the manufacture and sale of sausage and cereal, where the cereal was in excess of 2 per cent. This the Secretary of Agriculture had no power to do. * * * The question is simply: Could he prohibit the making of a compound which was sound, healthful, wholesome, and free from dyes, chemicals, preservatives, or ingredients which render such unfit for human food, by a mere regulation? We are constrained to say that he cannot. A compound of beef and pork would not entitle the Secretary of Agriculture to prohibit the words 'beef' and 'pork' to appear in the title, and to condemn all such compounds on the label of which they appear."

It is claimed that the Secretary of Agriculture has issued, effective November 1, 1914, a new set of "Regulations Governing the Meat Inspection of the Department of Agriculture," and that previous regulations are abrogated thereby. This was, of course, long after the commencement of this suit. These new regulations omit the preamble to the order of February 28, 1913, referred to in 215 Fed. 553, 556, 132

C. C. A. 65, 68. The new regulations divide the substance of the circular in question, and so far as material are as follows:

"Regulation 17. Labeling.

"Section 9.

"Paragraph 2. When cereal is added to sausage within the limit prescribed by paragraph 4 of section 6 of regulation 18, there shall appear on the label in a prominent manner, contiguous to the name of the product, the statement 'cereal added.' When water in excess of 3 per cent. and cereal are added to certain kinds of sausage as permitted by paragraph 5 of section 6 of regulation 18, the same shall be labeled 'sausage, water, and cereal'; but when no cereal is added, the addition of water need not be stated.

"Paragraph 3. When cereal is added to any meat food product other than sausage in quantities not exceeding 5 per cent., the statement 'cereal added' shall appear on the label in a conspicuous manner contiguous to the name of the product, and if any such product contains cereal in quantities exceeding 5 per cent., then 'cereal' shall appear as a part of the name of the product in uniform size and style of letters, for example, 'potted meat and cereal': Provided, however, that products such as meat loaves, pates, soups, tripe with onion sauce, Irish stew, stewed kidneys, hash, chile con carne, tamales, boiled dinners, chop suey, scrapple, and the like, may contain cereal and similar substances without the presence of such substances being indicated on the labels."

"Regulation 18. Reinspection and Preparation of Meat and Products.

"Section 6.

"Paragraph 4. Sausage shall not contain cereal in excess of 2 per cent.

"Paragraph 5. Water or ice shall not be added to sausage, except for the purpose of facilitating grinding, chopping, and mixing, in which case the added water or ice shall not exceed 3 per cent., except that sausages of the class which are smoked or cooked, such as Frankfort style, Vienna style, and Bologna style may contain added water in excess of 3 per cent., but not in excess of an amount necessary to make the product palatable."

It is manifest that this is but a rearrangement of the order of February 28, 1913. The prayer of the bill is not to set aside any order of the Department of Agriculture, but has been heretofore set forth in full. Surely a mere rearrangement of the regulations without changing their meaning would not deprive the complainant of the right to maintain this action. It is claimed, however, that the omission of the preamble to the order of February 28, 1913, has a material effect, and while the preamble showed the order was made to prevent misbranding, its omission and the transfer of a portion of the order from "Labeling" to "Preparation of Meat and Products," makes it evident that the Secretary has found, as alleged in the fifth paragraph of his answer, that sausage and cereal with the cereal in excess of 2 per cent. is unwholesome.

We will, for the purposes of this case, assume that the Agricultural Department has determined that sausage and cereal are not sound, healthful, and wholesome, although it appears that paragraph 3 of section 9 of the seventeenth regulation is in conflict with this assumption. It appears from the government's own testimony, as well as from this regulation itself, that under this provision the production of scrapple is permitted. Scrapple is defined by the Century Dictionary as:

' "An article of food something like sausage meat, made from scraps of pork, with liver, kidneys, etc., minced with herbs, stewed with rye or corn meal.

and pressed into large cakes.    When cold it is cut in slices and fried.    It is of Pennsylvania Dutch origin."

Roughly speaking, scrapple is simply sausage and cereal; the latter, however, largely preponderating.   It is not put up in any tin container, but as sold it is usually a loaf wrapped up.   The Department permits Armour & Co., to make sosera, in which there is sausage and unlimited cereal and water.   Other institutions put up other compounds of sausage and cereal under their fanciful names.   Meat loaf is so composed and manufactured with the approval of the Secretary.   In the actual administration of the law there is no controversy with the Department's officers, so long as they do not use the name "sausage" in the title.

We held in this case on the former appeal that the Department had no right to forbid the use of the word "sausage" on a compound in which it entered, provided the article was not sold under a false or fictitious name, and to that we adhere.   When this and the Pure Food Law were pending in Congress, it was well known that there were two distinct plans for pure food legislation.   One was to prescribe formulas; the other was to prescribe that food was to be sound, healthful, and wholesome, and that it should be truly branded.   See United States v. Lexington Mill Co., 232 U. S. 399, 34 Sup. Ct. 337, 58 L. Ed. 658, L. R. A. 1915B, 774.

This is well illustrated by the controversy which has raged for years about so-called alum baking powders.   A number of learned chemists have cheerfully testified on both sides of that question.   One side has sworn that the use of alum in baking powder in considerable quantities would make it highly injurious to health; the other has sworn that, while this would be true if the alum was retained in the finished product, the function of a baking powder was to generate a gas, which, in expanding, would rend the product apart and make it light, and the gas in so doing escaped, and there was no alum in the finished product.   Confronted by controversies like this, Congress passed the Pure Food Law and the Meat Inspection Law in the same session.   In neither of them did it prescribe standards of quality, but it required true branding, and the Meat Inspection Law prohibited the sale of food which is unsound, unhealthful, unwholesome, or otherwise unfit for human use.

We are not prepared to say the regulation in question has any application to the manufacture and sale of sausage and cereal, as distinguished from sausage; but the attempt to so construe it is an attempt to make the act of Congress do just what Congress had no thought of doing—prescribe formulas.

It is claimed that sausage and cereal will decay more rapidly than sausage.   The evidence for the defendants shows that under certain conditions fresh sausage, without any water or cereal, will become moldy in 10 days and putrid in 13.   Under the same conditions, with 3 per cent. of water and no cereals, it will become moldy in 6 days and putrid in 13 days.   With 3 per cent. of water and 2 per cent. of cereal, it will become moldy in 10 days and putrid in 10 days.   With no water and 2 per cent. of cereal, it will become moldy and sour in 10 days

and putrid in 13 days. With 10 per cent. of water and no cereal, it will become moldy and sour in 10 days and putrid in 13 days. With 10 per cent. of water and 2 per cent. of cereal, it will become moldy in 6 days and sour and putrid in 10 days. With no water and 5 per cent. of cereal, it will become moldy and putrid in 13 days. With 3 per cent. of water and 5 per cent. of cereal, it will become moldy in 10 days and putrid in 13 days, exactly the same time required for pure sausage to become moldy and putrid. With 10 per cent. of water and 5 per cent. of cereal, it became moldy and sour in 10 days. With 20 per cent. of water and 5 per cent. of cereal, it became moldy in 6 days and putrid in 10 days; and the same was true with 20 per cent. of water and 10 per cent. of cereal. It is claimed that the diminished life of the product is due to fermentation in the corn flour and water. While the length of life of the product seems to slightly vary in inexplicable manner, we shall assume that sausage, cereal, and water will become moldy in 6 days, which we shall also assume would stop its sale, while pure sausage would last 10 days. Does this authorize the Secretary of Agriculture to stop its sale while sound?

Regulation 18, section 1, paragraph 1, is:

"All meat and products, whether fresh or cured, even though previously inspected and passed, shall be reinspected by bureau employés as often as may be necessary, in order to ascertain whether the same are sound, healthful wholesome, and fit for human food at the time the same leave official establishments. If upon such reinspection any article is found to have become unsound, unhealthful, unwholesome, or in any way unfit for human food, the original mark, stamp, or label thereon shall be removed or defaced and the article condemned."

This regulation is clearly within the power of the Secretary of Agriculture, and enables him to see that no product is sold after it becomes moldy, sour, rancid, or putrid. It is a matter of common knowledge that there is the greatest variance in the keeping qualities of organic substances sold for human food. Some early summer apples are short-lived, while others will keep until the next crop is harvested. Could a public officer, who had the power to pass upon whether apples were sound, healthful, wholesome, and fit for human food, condemn summer apples, when they were faultless, because they would not keep as long as Ben Davis, for example? Can food be pronounced unsound, unhealthful, unwholesome, or unfit for human food because within some number of days after its manufacture and sale it may possibly become so?

The compound here in question is ordinarily delivered to the retailer within 24 hours and to the consumer within 48, and upon the assumption that we have made would grow moldy in 6 days, reaching the consumer 4 days before it has so far deteriorated as to become moldy. That is a matter concerning which the Secretary of Agriculture has nothing to do under the law. There is no claim that if the packers kept pure sausage for 4 days, and then offered to sell it to the retailer, the Department of Agriculture could prevent such sale, although confessedly it would have no longer life than the composition produced by the complainants has. While the answer in the fifth paragraph de-

nies that the cereal used is wholesome, there is much evidence that it is wholesome, and none that it is not. The Department now claims that the chief ingredient of the cereal is starch, and that to make this readily digestible it is required to subject it to more heat than the housewife ordinarily applies, and the failure to do this reduces the speed of digestion. Again, there is great variance in organic matter sold as food in the speed with which it is digested. Such variance does not constitute any of the food unsound, unhealthful, or unwholesome as these terms are used in the law.

We have already held that the Secretary of Agriculture may by his control over the labels prevent the sale of sausage and cereal under any false or deceptive name, and in this sense his regulations are valid that sausage shall not contain over 2 per cent. of cereal; but he has absolutely no power to refuse to have "passed" sausage and cereal which contains more than 2 per cent. of cereal, and if he has attempted to go further he has attempted to rewrite the act of Congress in his official capacity, and, if so, such assumption of authority by him is not conclusive on all the world. If he wants a law which will enable him to prepare formulas further than the present law does, he may or may not succeed in modification of the existing law.

[2] The defendants contend that the action of the Secretary of Agriculture in declaring meat products unsound, unhealthful, or unwholesome is conclusive. We have already shown that the Secretary has never in fact held that sausage and cereal were unwholesome; but, if he had, his finding would not be conclusive.

The first case cited by appellees is Marbury v. Madison, 1 Cranch, 137, 166, 2 L. Ed. 60. In that case the court said:

"The conclusion from this reasoning is that, where the heads of departments are the political or confidential agents of the executive, merely to execute the will of the President, or rather to act in cases in which the executive possesses a constitutional or legal discretion, nothing can be more perfectly clear than that their acts are only politically examinable. But where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured has a right to resort to the laws of his country for a remedy."

And on page 170 of 1 Cranch (2 L. Ed. 60):

"Where the head of a department acts in a case, in which executive discretion is to be exercised, in which he is the mere organ of executive will, it is again repeated that any application to a court to control in any respect his conduct would be rejected without hesitation. But where he is directed by law to do a certain act affecting the absolute rights of individuals, in the performance of which he is not placed under the particular direction of the President, and the performance of which the President cannot lawfully forbid, and therefore is never presumed to have forbidden, as, for example, to record a commission, or a patent for land, which has received all the legal solemnities, or to give a copy of such record, in such cases it is not perceived on what ground the courts of the country are further excused from the duty of giving judgment, that right be done to an injured individual, than if the same services were to be performed by a person not the head of a department."

In that case it was held an original action in the Supreme Court for mandamus could not be maintained, but that opinion shows it could have been maintained in a nisi prius court.

Appellees next cite Kendall v. United States, 12 Pet. 524, 9 L. Ed. 1181. That was a suit for a writ of mandamus against the Postmaster General of the United States in the United States Circuit Court of the District of Columbia to compel him to credit the amount allowed by the Solicitor of the Treasury to certain contractors who were the relators in the suit. The court held that the Solicitor of the Treasury had by the act of Congress been created an arbitrator and that his findings were conclusive. This is now elementary. The other cases held that the writ of mandamus cannot run, and one that the writ of injunction cannot issue to control the decision of an executive officer, which we cheerfully concede to be the law.

In Bates & Guild v. Payne, 194 U. S. 106, 108, 24 Sup. Ct. 595, 597 (48 L. Ed. 894), which was started by a bill to compel the recognition by the Postmaster General of the right of the plaintiff corporation to have a periodical publication known as "Masters in Music" received and transmitted through the mails as a matter of the second class, and to enjoin defendant from enforcing an order theretofore made by him denying it entry as such, the court said:

"But there is another class of cases in which the rule is somewhat differently, and perhaps more broadly, stated; and that is, that where Congress has committed to the head of a department certain duties requiring the exercise of judgment and discretion, his action thereon, whether it involve questions of law or fact, will not be reviewed by the courts, unless he has exceeded his authority or this court should be of opinion that his action was clearly wrong."

The case most nearly in point of any called to our attention is that of School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 23 Sup. Ct. 33, 47 L. Ed. 90. That was a case of a fraud order issued against the complainant by the Postmaster General. In the first place, that was a case involving an alleged healing system, which is, of course, somewhat similar to determining the question of wholesomeness of food. The court said:

"That the conduct of the Post Office is a part of the administrative department of the government is entirely true, but that does not necessarily and always oust the courts of jurisdiction to grant relief to a party aggrieved by any action by the head or one of the subordinate officials of that department which is unauthorized by the statute under which he assumes to act. The acts of all its officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief."

And again:

"Conceding, arguendo, that when a question of fact arises, which, if found in one way would show a violation of the statutes in question in some particular, the decision of the Postmaster General that such violation had occurred, based upon some evidence to that effect, would be conclusive and final, and not the subject of review by any court, yet to that assumption must be added the statement that if the evidence before the Postmaster General, in any view of the facts, failed to show a violation of any federal law, the determination of that official that such violation existed would not be the determination of a question of fact, but a pure mistake of law on his part, because the facts

being conceded, whether they amounted to a violation of the statutes, would be a legal question and not a question of fact. Being a question of law simply, and the case stated in the bill being outside of the statutes, the result is that the Postmaster General has ordered the retention of letters directed to complainants in a case not authorized by those statutes."

And again:

"The facts, which are here admitted of record, show that the case is not one which by any construction of those facts is covered or provided for by the statutes under which the Postmaster General has assumed to act, and his determination that those admitted facts do authorize his action is a clear mistake of law as applied to the admitted facts, and the courts, therefore, must have power in a proper proceeding to grant relief. Otherwise, the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law and is in violation of the rights of the individual."

That whole case is worthy of careful consideration.

In Howe v. Parker, 190 Fed. 738, at page 746, 111 C. C. A. 466, at page 474, this court, speaking by Sanborn, Presiding Judge, said:

"Whether or not the weight of evidence in substantial conflict sustains the one or the other side of an issue of fact is a question upon which, in cases within his jurisdiction, the final decision of the Secretary of the Interior is conclusive, in the absence of fraud or gross mistake. But whether or not there is at the close of a final trial or hearing before him any evidence to sustain a charge or a finding of fact in support of it is in his and in every judicial and quasi judicial tribunal a question of law. Ward v. Joslin, 186 U. S. 142, 147, 22 Sup. Ct. 807, 46 L. Ed. 1093; United States Fidelity & G. Co. v. Board of Com'rs, 145 Fed. 144, 151, 76 C. C. A. 114, 121; Laing v. Rigney, 160 U. S. 531, 540, 16 Sup. Ct. 366, 40 L. Ed. 525; Southern Pacific Co. v. Pool, 160 U. S. 438, 440, 16 Sup. Ct. 338, 40 L. Ed. 485; The Francis Wright, 105 U. S. 381, 387, 26 L. Ed. 1100; Clement v. Insurance Co., 7 Blatchf. 51, 53, 54, 58, Fed. Cas. No. 2,882; Delaware, Lackawanna & Western R. Co. v. Converse, 139 U. S. 469, 472, 11 Sup. Ct. 569, 35 L. Ed. 213. And an injurious error of the Secretary in finally deciding that question presents good ground for relief in equity. The Land Department of the United States is a quasi judicial tribunal, invested with authority to hear and determine claims to the public lands subject to its disposition, and its decisions of the issues presented at such hearings are impervious to collateral attack. But its judgments and patents do not conclude the rights of claimants to the land. They rest on established principles of law and fixed rules of procedure, the application of which to each case conditions its right decision, and if the officers of the Land Department are induced to issue a patent to the wrong party by an erroneous view of the law, or by a gross mistake of the facts proved, or by a decision induced by fraud, the rightful claimant is not remediless. He may in a court of equity avoid the effect of the decision and the patent, and charge the legal title derived from it with a trust in his favor"—citing numerous authorities.

It is claimed that, while complainants sold their sausage and cereal at less than the price of sausage, they did not make such a reduction as they might have made, and this was a fraud upon the public, and makes complainant's hands unclean, and the rule that he who comes into a court of equity must come with clean hands precludes a recovery by them. That plaintiff sold the combination cheaper than pure sausage and at an agreed price, even though it may have given them a somewhat larger profit than they could realize on pure sausage, was not such a fraud as to preclude their maintaining this action.

The case is reversed and remanded, with directions to the District

Court to set aside its decree dismissing the complainant's bill and award plaintiffs a decree substantially as prayed, reserving the right of the defendants to apply for a modification of the injunction upon a showing that the Secretary has adopted new regulations as to labeling sausage and cereal, requiring that the label show that cereal in excess of 3 per cent. and water are used in the compound.

AMIDON, District Judge (dissenting). This case has followed an unusual course, and has led to unfortunate results. When it was here on appeal from the order denying the preliminary injunction, this court, without any judicial investigation of the facts, decided that the name "sausage" could be deprived of its false and deceptive character, when applied to plaintiff's product, by the use of qualifying words, and ordered the temporary injunction to issue. The case then went back to be tried in the lower court upon the merits, but this court had already precluded such an investigation. Our decision was held to be binding upon the trial court that the name was not false and deceptive, and that court was shut up to an investigation of whether plaintiff's product was unwholesome. The result is that the question whether the name is false and deceptive, as used in the channels of trade, is finally decided by this court against the decision of the Department solely on bill and answer, and without any investigation of the question. Fortunately, if this case shall be taken to a higher court for review, our decision on the appeal from the order denying a temporary injunction will be open for re-examination. I shall therefore take occasion now to express my own views upon both branches of the case.

Speaking first to the question of unwholesomeness, the trial court has found as the result of the evidence adduced at the trial that plaintiff's product is unwholesome, and this is in accord with the findings of the department. I think those findings are binding upon this court, and should not be disturbed, and upon that ground the decree should be affirmed.

The case for the government, however, is much stronger upon the ground that the use of the name "sausage," either singly or in connection with other words, when applied to plaintiff's product, is false and deceptive, and I shall now state my views on that subject.

"No meat or meat food products shall be sold or offered for sale by any person, firm or corporation in interstate or foreign commerce under any false or deceptive name. But established trade name or names which are usual to such products, and which are not false or deceptive, and which shall be approved by the Secretary of Agriculture are permitted."

This is the provision of the Meat Inspection Law upon which this case turns. It does not help to a proper decision to emphasize the part of the law which deals with unwholesome meat as a reason for minimizing the provision which I have quoted. By a later section of the statute the Secretary of Agriculture is given full power to make rules and regulations necessary to carry all provisions of the law into effect.

The difference of view between myself and the majority of the court may be stated in a few words. They believe that the Secretary

of Agriculture, in preventing the use of false and deceptive names, is confined to inventing qualifying words which in their judgment will be sufficient to prevent the names being false and deceptive. That it seems to me, is only a part of his power, and to confine him thus to the dictionary is to take away other and more practical powers which the law confers. It is said by the majority that the law does not give the Secretary power to fix the standards for meat products. That, it seems to me, is sticking in mere forms of words. It may be that the Secretary's rules could have been expressed in better phraseology. His letter, however, by which the rules were promulgated, makes clear their purpose. There it is declared that they are enacted "for the purpose of preventing the use in interstate or foreign commerce of meat or meat food products under any false or deceptive name." In the light of this purpose the rules must be interpreted as if they read:

"The name 'sausage' shall not be used upon any package containing a meat food product if the product contains cereal in excess of 2 per cent. or added ice or water in excess of 3 per cent.," etc.

Thus interpreted the rules come within the authority of the Secretary of Agriculture to make rules and regulations for the purpose of carrying into effect that provision of the statute which forbids the use of false and deceptive names upon meat food products.

One of the most effective ways of preventing names being false and deceptive is to fix the standard of articles to which those names may be applied. The law not only authorizes the Secretary of Agriculture to compel the use of qualifying words when that method will prove effective, but it likewise empowers him to say that a trade term like "sausage," which will be understood by the general public to include certain elements in the article, shall not be used if the article does not possess those elements. That is a practical way of preventing the use of the name for false and deceptive purposes. The record in this case shows that the Secretary of Agriculture has tried for years to deal with the subject by the use of qualifying words which indicate that other elements like cereal or potato have been added, and we ought to conclude, from the fact that he has abandoned that method, that he has found as the result of the actual experiences of commerce that it is ineffective, and that the word "sausage," even with such qualifiers, still continues to be false and deceptive to the public. As the result of that experience he has changed his method of attack. My Brethren seem almost to assume that an equitable estoppel in pais ought to be applied to his adopting these new measures because of his unsuccessful experiences in using modifying terms. Such a view deprives that officer of the right to profit by experience.

Names and things are but the reverse sides of a single shield. One of the ways to prevent names being deceptive it to prescribe the qualities of articles to which they may be properly applied. That is one of the large features of the Pure Food and Drug Act (Act June 30, 1906, c. 3915, 34 Stat. 768 [Comp. St. 1916, §§ 8717–8728]). Those who deceive by the use of trade-names understand this well. Their whole art consists in taking from an article having a familiar name some of the qualities which its name implies, and then continuing to apply the

name to the changed article. Plaintiff admits that this is precisely what it is doing. It tells us that sausage was until quite recently made from lean meat. The poorer qualities of sausage are now made from ears, snouts, livers, and other parts of the animal that were formerly waste. These cheaper parts, however, are deficient in fiber, necessary to give the sausage proper consistency. To meet this difficulty something else must be used as a binder. Cornmeal and water supply that need; so the plaintiff adopts them. That all sounds like progress in the industry and the saving of waste. We must not, however, allow it to deceive us. What has really been done is, not only to substitute a poorer quality of food for a better, but to substitute cornmeal and water in place of meat. To apply the old name to this changed article is to make it false and deceptive. In the actual experiences of the meat trade, the addition of modifying words may be wholly ineffective to prevent the deception. My Brethren say, however, that that is the only remedy which the law permits. In my judgment, the statute clearly submits the whole subject to the Secretary, and the able corps of scientific men associated with him, to adopt whatever measure seems wise as the result of their studying the actual facts of the meat trade. It is an unwarranted use of judicial power for a court sitting in a law library to substitute its judgment for that which the law commits wholly to these administrative officers.

There is no just ground for holding that the regulations of the Secretary, or his refusal to stamp plaintiff's products as inspected and passed, are arbitrary. (a) The standard fixed by the regulations is in accord not only with the legislative action of the state of Pennsylvania, but with the scientific investigations of the best students on the subject, particularly the investigation of the Association of German Food Chemists at their tenth general meeting held at Dresden in May, 1911, and numerous other associations of food experts referred to in the briefs for the government. (b) The government inspectors have not refused to mark plaintiff's products, if sound and wholesome, "Inspected and Passed," if they are put up under some name of which the word "sausage" is not the distinctive feature, but base their refusal upon the ground that plaintiff insists upon the right to use the term "sausage," either singly or in composition, and that to permit it to do this would be to approve a false and deceptive name.

The majority opinion really comes to this: Appellant may make any combination of meat, cereals, and water which it sees fit, and affix the name "sausage" to the product, and the power of the Secretary of Agriculture is confined to inventing qualifying words or phrases to prevent this product from being false and deceptive. That I cannot regard as a sound interpretation of the statute. It clothes the department with power to prohibit the use of a name in connection with a product when the product is of such a character as to make the name false and deceptive. In the exercise of that power the Secretary may forbid the use of the name at all in connection with the compound, if in the good-faith exercise of his judgment he is of the opinion that the name, when thus used, is false and deceptive. It may well occur that no qualifying phrase which can be invented will take away the false and deceptive quality of the name in the channels of trade.

The dictionaries all tell us that sausage means a compound of meat, sage, and spices, and I agree with the trial court, and the Supreme Court of Michigan (Armour & Co. v. Bird, 159 Mich. 1, 123 N. W. 580, 25 L. R. A. [N. S.] 616), that this is what it means to the general public.   Standard authorities say that 10 per cent. of cereal will absorb 30 per cent. of water.   So, if appellant may exercise the right which it claims in its bill, the purchaser who thinks he is getting a meat product will be getting 40 per cent. of cornmeal and water   Considering the present high prices of meat, that is probably as clear a fraud as any transaction that has been condemned under the Pure Food and Drugs Act.

I cannot accept the view that the mark "Inspected and Passed" has nothing to do with the name, but means only that the meat product is wholesome and free from dyes and other forbidden ingredients.   The section here involved has to do with food products placed or packed in cans or other receptacles.   As to these the statute provides that the inspection is not complete until the package is labeled and sealed, or closed under the supervision of an inspector, and as a part of the same sentence it is provided that the meat products thus put up shall not be sold under a false or deceptive name.   By the department rules the essential features of the label are:   (1) The true name of the product; (2) the inspection legend; (3) the establishment number.   From these provisions I think the words "Inspected and Passed," when placed upon the label of which the name is a part, fairly mean, and will be understood by the purchaser of the package to mean, not only that the food product is wholesome and fit for food, but that the name is not false or deceptive when applied to the contents of the package.   Under the statute it is as much the duty of the Secretary of Agriculture to protect the public against fraud by a deceptive name as against poison by an unwholesome article, and when a package with a name upon it is stamped "Inspected and Passed," I can find no reason why the Secretary should not see to it that the article is true to the name as well as wholesome.   Congress goes so far as to say that established trade-names may not be used if they are deceptive, and requires even such names to be approved by the Secretary of Agriculture.   This, in my judgment, commits to that officer the determination, not only what name shall be used, but what thing shall be entitled to use established trade-names.

There is another independent ground for the affirmance of the decree.   It is manifest upon the record that plaintiff's cereal and water sausage is a cheat upon the poor to whom it is mainly sold.   Such ancient maxims as "he that doeth iniquity shall not have equity" forbid the granting to it of any relief.   Our decision, however, awards the extraordinary writ of mandatory injunction commanding officers to stamp what they have found to be a fraud "Inspected and Passed," thus compelling them to aid and abet the fraud which they were appointed to prevent.

In my judgment the decree dismissing the bill was clearly right and should be affirmed.