BROUGHAM et al. v. BLANTON MFG. CO.

(Circuit Court of Appeals, Eighth Circuit. May 14, 1917.)

No. 4584.

1. COURTS ⬤ 273—FEDERAL COURTS—JURISDICTION—INJUNCTION.
   An injunction may be granted against subordinates of the Secretary of Agriculture for attempting to enforce his unlawful orders, though the Secretary of Agriculture, not being within the district and not appearing, could not have been enjoined.

2. FOOD ⬤ 1—CONGRESS—POWERS OF—REGULATION.
   The enactment of the Oleomargarine Acts (Act Aug. 2, 1886, c. 840, 24 Stat. 209; Act May 9, 1902, c. 784, 32 Stat. 193), under Const. art. 1, § 8, par. 1, declaring that Congress shall have the power to lay and collect taxes, duties, imposts, and excises, does not restrict the power of Congress to regulate commerce with foreign nations and among the several states and with the Indian tribes, conferred by paragraph 3 of the same section; and hence the Meat Inspection Act June 30, 1906, c. 3913, 34 Stat. 669, and Pure Food Act (Act June 30, 1906, c. 3915, 34 Stat. 768 [Comp. St. 1916, §§ 8717–8728]), apply to oleomargarine dealers, notwithstanding the prior law.

3. EVIDENCE ⬤ 7—JUDICIAL NOTICE—OLEOMARGARINE.
   It is a matter of common knowledge that oleomargarine is a meat food product, and hence Meat Inspection Act June 30, 1906, applies to manufacturers of oleomargarine.

4. FOOD ⬡⟿8—OLEOMARGARINE—MEAT INSPECTION LAW—TRADE-NAME.

Meat Inspection Act June 30, 1906, declares that no meat or meat food products shall be sold or offered for sale by any person, firm, or corporation in interstate or foreign commerce under any false or deceptive name, but established trade name or names which are usual to such products, and which are not false or deceptive, and which shall be approved by the Secretary of Agriculture, are permitted. Prior to the enactment of the Meat Inspection Act plaintiff, a manufacturer of oleomargarine, adopted the trade-name "Creamo Oleomargarine," registration of which as a trade-mark was allowed subsequent to the enactment of the law. Thereafter the Agricultural Department officially approved the trade-name, and complainant expended large sums in advertising its product as "Creamo Oleomargarine." Cream was not always used in the manufacture of complainant's oleomargarine. *Held*, that the trade-name was not deceptive, and the Agricultural Department having approved it, it could not thereafter retract its approval and compel complainant to abandon the trade-name.

Amidon, District Judge, dissenting.

Appeal from the District Court of the United States for the Eastern District of Missouri; David P. Dyer, Judge.

Suit by the Blanton Manufacturing Company against James J. Brougham and another. From a decree for complainant, defendants appeal. Affirmed.

Arthur L. Oliver, U. S. Atty., of St. Louis, Mo., for appellants.

Shepard Barclay, of St. Louis, Mo. (S. Mayner Wallace, of St. Louis, Mo., on the brief), for appellee.

Before SANBORN and SMITH, Circuit Judges, and AMIDON, District Judge.

SMITH, Circuit Judge. The Meinecike-Blanton Manufacturing Company commenced the manufacture of oleomargarine about 1902. It adopted the trade-mark "Creamo Oleomargarine" for its goods about 1904. It was succeeded by the appellee the Blanton Manufacturing Company. August 2, 1886 (24 Stats. 209, c. 840), Congress passed a law imposing a tax of $600 a year upon all manufacturers of oleomargarine. On May 9, 1902, Congress greatly elaborated this law. 32 Stat. 193, c. 784, U. S. Compiled Stats. 1916, § 5977. Section 6 of the act (24 Stats. 209, 210) contained the following:

"Sec. 6. That all oleomargarine shall be packed by the manufacturer thereof in firkins, tubs, or other wooden packages not before used for that purpose, each containing not less than ten pounds, and marked, stamped, and branded as the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, shall prescribe; and all sales made by manufacturers of oleomargarine, and wholesale dealers in oleomargarine shall be in original stamped packages."

The plaintiff's brand was approved by the Commissioner of Internal Revenue January 19, 1904, and prior to the enactment of the meat inspection law or the pure food law. The label in question has always remained thus approved. On June 30, 1906, Congress passed both the meat inspection law (Act June 30, 1906, c. 3913, 34 Stats. 669, 674) and the pure food law (Act June 30, 1906, c. 3915, 34 Stats. 768 [Comp.

St. 1916, §§ 8717–8728]). On April 4, 1907, the Department of Agriculture having taken charge of the inspection of the oleomargarine factory of the Blanton Manufacturing Company under the claim that its oleomargarine was a meat food product, the Secretary of Agriculture approved the labels on the packages then in use under the trade-name "Creamo Oleomargarine." On January 6, 1908, the complainant made application to register the trade-mark "Creamo Oleomargarine" in the United States Patent Office. This registration was allowed on January 9, 1908. The Blanton Manufacturing Company continued for years to sell its goods under this label with the express approval or acquiescence of the Treasury and Agricultural Departments. On July 8, 1912, the defendant was expressly officially notified of the approval of the trade label "Creamo Oleomargarine" by the Agricultural Department. For many years the company has spent an average of $7,500 a year in advertising the commodity under this name and in the past 10 years has spent $75,000 in that way, but the Department commenced to complain in about 1912 of the use of the word "Creamo." Up to that time the Blanton Manufacturing Company had spent between $35,000 and $40,000 in such advertising. On October 2, 1912, the Chief of the Bureau of Animal Industry wrote the Blanton Manufacturing Company that the use of "Creamo" was considered deceptive and misleading, and the Bureau must therefore decline to continue permitting the use of this name in connection with oleomargarine. The letter recited that the Bureau's approval of the use of this name was formerly given. On February 10, 1914, the inspector in charge at St. Louis notified the Blanton Manufacturing Company that on and after March 1, 1914, "the use of that label will not be allowed."

Thereupon the Blanton Manufacturing Company brought suit in the court below against Dr. James J. Brougham, chief inspector in the city of St. Louis of the Bureau of Animal Industry of the Department of Agriculture, Arthur N. Stankey, local inspector of said Bureau in charge of the inspection at the manufacturing plant of the Blanton Manufacturing Company, Dr. Alonzo D. Melvin, Chief of said Bureau, and Hon. David F. Houston, Secretary of Agriculture of the United States, praying that this "court may grant to plaintiff a writ of injunction * * * perpetually enjoining and restraining said defendants from interfering with the use and enjoyment by plaintiff (in interstate commerce or otherwise) of its said trade-mark 'Creamo' Oleomargarine upon its labels now in use in its said business as above described, and from attempting to deprive plaintiff of the use thereof," and for general equitable relief. Dr. Brougham and Arthur N. Stankey were served with process and filed answer, but the Secretary of Agriculture and the Chief of the Bureau of Animal Industry were not found in the district and did not appear. The case was tried upon the issues joined as between the complainant and Messrs. Brougham and Stankey, and the court found the issues in favor of the plaintiff and enjoined Dr. James J. Brougham and Arthur N. Stankey, their agents, successors, and employés, from interfering with the use and enjoyment by the plaintiff, its successors, and assigns, in interstate commerce and otherwise of the said trade-mark "Creamo" upon stencils and la-

bels as theretofore approved and used on packages of various sizes for the sale of oleomargarine, and Messrs. Brougham and Stankey appeal.

[1] It is first contended by the appellant that no injunction could rightly have been granted against the appellants, because such an injunction could not have been properly granted against the Secretary of Agriculture. In St. Louis Independent Packing Co. v. Hon. David F. Houston, —— C. C. A. ——, 242 Fed. 337, we recently had occasion to fully examine this question, and following that case we hold that this injunction could properly have issued against the Secretary of Agriculture, had he been served or appeared, and he not being within the jurisdiction of the court, but having his subordinates there, who, it it was alleged, were violating the law or about to violate it, upon a proper showing an injunction could issue against them.

[2] The plaintiff first insists that its business is governed wholly by the Oleomargarine Law (24 Stat. 209; 32 Stat. 193) and that neither the Secretary of Agriculture nor the Bureau of Animal Industry has under the Meat Inspection Law any power or control over the complainant's business. The Oleomargarine Law was enacted under the power of Congress (Constitution, art. 1, § 8, par. 1):

"The Congress shall have power to lay and collect taxes, duties, imposts and excises."

While the Meat Inspection Law and the Pure Food Law were enacted under the power conferred by Const. art. 1, § 8, par. 3:

"To regulate commerce with foreign nations, and among the several states, and with the Indian tribes."

Whatever may have been the ulterior purpose in the passage of the Oleomargarine Law, it cannot be held that anything in it tended to substract any power subsequently conferred on the Secretary of Agriculture under the Meat Inspection Law, or upon the Secretary of the Treasury, the Secretary of Agriculture, or the Secretary of Commerce and Labor under the Pure Food Law. The first, the Oleomargarine Law, was enacted in the exercise of the taxing power, and this could not prevent Congress, under the power to regulate commerce, enacting the Pure Food Law and the Meat Inspection Law in the interest of the public health or welfare.

[3, 4] The Meat Inspection Law, in what may be called the preamble (34 Stat. 669, 674), declares that it is enacted for the purpose of preventing the use in interstate or foreign commerce as hereinafter provided of meat and meat food products which are unsound, unhealthful, unwholesome or otherwise unfit for human food, and further provides (page 675):

"That for the purposes hereinbefore set forth the Secretary of Agriculture shall cause to be made by inspectors appointed for that purpose an examination and inspection of all meat food products prepared for interstate or foreign commerce in any slaughtering, meat-canning, salting, packing, rendering, or similar establishment."

And it provides for marking the same "Inspected and Passed," or "Inspected and Condemned," and the consequences. Meat food products were not more definitely defined and the Secretary of Agriculture

in July, 1910, secured the opinion of the Attorney General as to the true definition. 28 Op. Atty. Gen. 369. It is provided in the Meat Inspection Law (34 Stat. 678):

"Said Secretary of Agriculture shall, from time to time, make such rules and regulations as are necessary for the efficient execution of the provisions of this act, and all inspections and examinations made under this act shall be such and made in such manner as described in the rules and regulations prescribed by said Secretary of Agriculture not inconsistent with the provisions of this act."

The Attorney General, first having held that the term "similar establishments" as used in the law was intended to include all establishments that were not specially mentioned in which the animal is slaughtered or the carcasses or meat are prepared or in which the meat food product is manufactured, then held that the term "meat food product" does not merely embrace a food which consists wholly of the meat of an animal and that the determination of the meaning of the term "meat food product" is essential to the proper enforcement of the Meat Inspection Law, and as Congress has not defined the term, and it has no well-defined meaning, but is one of common use, and Congress having vested in the Secretary of Agriculture the power to make such rules and regulations as may be necessary for the efficient execution of the provisions of the act, the power to determine what manufactures are meat food products rests in the Secretary of Agriculture, subject to the restriction that the definition of the term adopted be not clearly or unquestionably outside the intent of the act. It may not be without importance to state that the opinion was delivered in a case of a compound which consisted of 80 per cent. cotton seed oil, clearly not a meat food product, and 20 per cent. of oleo stearin, a meat food product. There is no evidence that oleomargarine is not a meat food product, and we regard it as a matter of common knowledge that it is such a product, and clearly, therefore, its manufacture comes within the language of the Meat Inspection Law.

The Meat Inspection Law (34 Stat. 676) provides:

"No such meat or meat food products shall be sold or offered for sale by any person, firm, or corporation in interstate or foreign commerce under any false or deceptive name; but established trade name or names which are usual to such products and which are not false and deceptive and which shall be approved by the Secretary of Agriculture are permitted."

We are not desirous of deciding more than is before us, and must pass upon the question whether the Department of Agriculture could pass upon and approve a trade-name under this last statute, which we find "Creamo Oleomargarine" was and is, and approve it in 1907 and again in 1912, and later, after an established business had been built up under that name, and a vast sum of money expended in the business, with or without evidence, change its ruling, and refuse to allow the use of the trade-name.

It is not claimed, as we understand it, that the public was deceived by the use of the name "Creamo Oleomargarine." The use of it is objected to upon its similarity to the word "cream," and upon the assumption that some of the public may be deceived into believing that

cream is contained in the oleomargarine. The word is not "cream," but "Creamo." It is a rule that words merely descriptive cannot constitute a trade-mark, because descriptive words cannot be expressly appropriated, and that it is essential to a valid technical trade-mark that the words or phrases be used in a purely arbitrary or fanciful way as applied to the goods in question. "Creamo" is not a word in common use among English-speaking people, but is such a fanciful word used by the complainant. But, even if the term had been "Cream Of," it would not be objectionable as a brand upon manufactured goods. There is a well-known brand of cigars known as "Cremo Cigars." "Cream of Wheat" is a brand used for breakfast food, and "Cream Baking Powder" is a well-known brand of that article. No one has ever assumed there is any cream in the cigar, in the Cream of Wheat, or in the Cream Baking Powder.

Could the Department of Agriculture approve the use of the label "Creamo Oleomargarine," as provided in the Meat Inspection Law, and then, after a trade had been built up and extended under that name, and vast sums of money expended in advertising it, change its ruling and forbid its use unless 10 per cent., for instance, of cream was used in the manufacture? We are constrained to say that we do not think any such power was vested in the Secretary of Agriculture.

The decree of the District Court was right, and it is affirmed.

AMIDON, District Judge (dissenting). I take the facts from the testimony of Mr. Blanton, president of the plaintiff company, below. They are uncontroverted. When the name "Creamo" was selected, plaintiff was using 30 per cent. of cream in its product. The name was chosen to indicate to the consumer and to the trade that cream was used in producing plaintiff's oleomargarine. The fact is that plaintiff sometimes uses cream, sometimes it uses no cream, and sometimes it uses skim milk. Whatever the practice, the product is all sold under the name "Creamo Oleomargarine." At the same time that the name here involved was chosen, plaintiff had another brand of oleomargarine, which it marked "Fulcreme," and another one "Extracreme." These were used continuously until they were withdrawn in 1912, by order of the Department. Plaintiff's letter head, used generally in its business, states with a conspicuousness which cannot easily be reproduced that the Blanton Company are "churners of Creamo, the only full cream Butterine." These are a few of the conspicuous features of the evidence, showing that plaintiff has habitually represented that cream is used in its product. It is also plain that to induce that belief is a decided trade advantage. It is conceded by plaintiff that the representation is false. The name "Creamo" was chosen as a part of this deception. Mr. Blanton himself testifies with emphasis that the name was chosen to convince the consumer and the trade that cream was an important element in the production of his company's product. As that product is conceded sometimes to contain no cream, and sometimes to be made by the use of skim milk, the name is false and deceptive. The proof is further emphasized by the fact that plaintiff, in its negotiations with the Department, refused

to add to its label the statement, "contains no cream," or a statement of the percentage of cream used. It is stated that the word "Creamo" is a fancy word, and will be so understood. That, it seems to me, is to indulge in one of the simplest of logical fallacies. Like most words in the language, cream has a figurative and a literal meaning. It may signify excellence of quality, or it may mean the part of milk that comes to the surface. When the term is applied to a cigar or a breakfast food, it is plain enough that it is used in its figurative sense. It will not cause anybody to believe that cream is used in making the cigar or the cereal. How stands the matter in the case of oleomargarine? It has been one of the trade frauds, from the time that article was invented, to palm it off as a dairy product. The states and the national government have been engaged for more than a generation in trying to defeat that trade deception. To create the belief that cream is used in the production of oleomargarine has been a part of the fraud. Mr. Blanton is a "practical" man. He probably knew what he was doing when he selected the word "Creamo." He says he chose it to make the consumer and the trade believe that cream was used in the production of his article. To say that the term "cream" will not deceive when it is applied to oleomargarine, because it does not deceive when applied to a cigar, seems too manifest a fallacy to require answer. As a matter of fact, therefore, I do not see how a plainer demonstration could be made that a trade-name is false and deceptive than has been made in this case.

I hesitate, however, to go into this subject, for in my judgment it is committed exclusively to the Secretary of Agriculture by the statute which is quoted in the majority opinion. I am at a loss to harmonize the opinion in this case and that rendered in the recent case of St. Louis Independent Packing Co. v. Houston, with the uniform practice of this court and of the Supreme Court, in holding that decisions of the Postmaster General and the Secretary of the Interior on questions of fact are conclusive. Acting upon that principle, the decisions of the Land Department, and of the Post Office. determining questions of fact in the disposition of the public lands, and in passing upon what forms of business are fraudulent so as to subject them to a fraud order, we have uniformly held that the decisions of those departments are binding upon the courts, and have refused to enter upon any review of their decisions, although the gravest interests were involved, and the most serious charges of mistake and sometimes of fraud were made. The general rule was stated by the Supreme Court, upon a full review of the authorities, in Bates & Guild Co. v. Payne, 194 U. S. 106, 109, 24 Sup. Ct. 595, 597 (48 L. Ed. 894) as follows:

"The rule upon this subject may be summarized as follows: That where the decision of questions of fact is committed by Congress to the judgment and discretion of the head of a department, his decision thereon is conclusive, and that even upon mixed questions of law and fact, or of law alone, his action will carry with it a strong presumption of its correctness, and the courts will not ordinarily review it, although they may have the power, and will occasionally exercise the right of so doing."

The doctrine of this court and the Supreme Court on this subject is so axiomatic as to make the citation of authorities unnecessary. Why should not the same rule be applied to the Secretary of Agricul-

ture while enforcing the Meat Products Act? The jurisdiction is the same. The law in plain terms commits to that officer to determine when a trade-name is false and deceptive; and yet in this case, and in the other case to which I have referred, this court exercises a power to review his decision which would hardly be exercised in reviewing the findings of a master in chancery. I myself am unable to assign any reason for this variety of practice as between the Postmaster General and the Secretary of the Interior on the one hand, and the Secretary of Agriculture on the other, and can find none in the opinion in this case or in the other case.

The opinion in the present case seems to be based mainly upon the ground that the name, "Creamo Oleomargarine" had been approved by the Department in 1908 and in 1912, and plaintiff has expended money in advertising the name, and it is indicated that these facts deprive the Department of the power to forbid the use of the name although satisfied that it is false and deceptive. That, it seems to me, is a doctrine fraught with the gravest danger. It has been uniformly held that even the most solemn acts of legislation, pursuant to which parties have invested large sums of money, can in no way impair the authority of the state to exercise its police power. Fertilizing Co. v. Hyde Park, 97 U. S. 659, 24 L. Ed. 1036; Texas & N. O. Railroad Co. v. Miller, 221 U. S. 408, 414, 31 Sup. Ct. 534, 55 L. Ed. 789, are cases in which this familiar rule is cited and applied. Can it be possible, then, that a mere executive officer by his mistake, honest or corrupt, can destroy within the field of his jurisdiction, a police statute of the nation? It has been the uniform holding of the courts that the conduct of such officers cannot impair the rights of the government even in civil matters. United States v. Pine River Logging & Improvement Co., 89 Fed. 907, 917, 32 C. C. A. 406; United States v. Lee Wilson Co. (D. C.) 214 Fed. 630, 651. It seems to me too plain for debate that an executive officer appointed to enforce a statute cannot by any act or omission of his impair the power of the government through a subsequent officer, to enforce a police statute. To hold otherwise is to give such officers the power to annul the law. It might well happen that the use of a name at the time of its selection, and even for years thereafter, would appear to be innocent, and would be approved in the routine course of administrative business; then upon a careful investigation it would be found that the name was chosen and was actually used in the channels of trade for false and deceptive purposes. That seems to be what has occurred in the present case. It seems to me an alarming doctrine that the approval of a name which was in effect selected for purposes of deception can destroy the power of the government to stop the fraud. Some point is made in the brief that the plaintiff has a registered trade-mark for the term "Creamo Oleomargarine." This seems to have troubled the Department in dealing with the name. It is, however, settled law that a trade-mark that is chosen for fraudulent purposes will not be protected even in civil litigation; much less can such a trade-mark be used to impair the power of the government to enforce a police statute.

In my judgment both on the law and the facts, the decree made by the trial court was conspicuously improper, and should be reversed.